IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Clarke A. Reposa, Sr. (F/V Dona Maria); Todd Chappell, and Reposa Fisheries, Inc. (F/V Sister Alice)

Plaintiffs,

V. CA No. 04–494S

The United States of America, acting by and through, Donald L. Evans, in capacity as Secretary of Commerce, and Conrad C. Lautenbacher, Jr., in capacity as Undersecretary of Commerce and NOAA Administrator

Defendants.

**GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the United States of America, by and through its attorneys, pursuant to Fed. R. Civ. P. 56, and moves for summary judgment for the reason that there is no genuine issue as to any material fact and the government is entitled to judgment as a matter of law.

Respectfully submitted,

UNITED STATES OF AMERICA

By its attorneys,

ROBERT CLARK CORRENTE
United States Attorney

Michael P. Iannotti

MICHAEL P. IANNOTTI
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of November 2005, I caused a copy of the foregoing **GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT** and supporting memorandum of law to be forwarded, by regular mail, to:

Leonard L. Bergersen, Esq.
1070 Kingstown Road
Peace Dale, RI 02883

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Clarke A. Reposa, Sr. (F/V Dona Maria); Todd Chappell, and Reposa Fisheries, Inc. (F/V Sister Alice) | ) | |
| Plaintiffs, | ) | |
| V. | ) | CA No. 04–494S |
| The United States of America, acting by and through, Donald L. Evans, in capacity as Secretary of Commerce, and Conrad C. Lautenbacher, Jr., in capacity as Undersecretary of Commerce and NOAA Administrator | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF**
**GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

On September 7, 2005, the plaintiffs filed a Complaint in this Court challenging the validity of the defendants' civil administrative proceeding against them. The defendants issued charges in an administrative proceeding against the plaintiffs for violating federal fishing regulations under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. §§ 1801 et seq. The plaintiffs were charged with illegally landing regulated species of groundfish, submitting false reports, and making false statements. A final administrative decision was rendered imposing a $45,000 civil penalty jointly and severally against Todd Chappell and Reposa Fisheries, Inc. as owner and operator of the fishing vessel (F/V) Sister Alice, a $40,000 civil penalty against Clarke A. Reposa, Sr. as owner and operator of the F/V Dona Maria, 90-day permit suspensions of the two vessels' permits[1], and 90-day suspensions of Todd Chappell and Clarke A. Reposa, Sr.'s operator

[1]The ALJ's Initial Decision and Order, dated June 11, 2003 (Volume V, Exhibit 172)(hereinafter "Vol. V: 172"), was modified in a Modified Decision and Order Based on Post-Hearing Motions, dated August 13, 2003 (Vol. V: 178), in response to motions filed by both the plaintiffs and the National Oceanic and Atmospheric Administration (NOAA). The modified suspensions are to be served in 30-day

permits.[2]

Plaintiffs now seek judicial review of the defendants' administrative proceeding under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, asserting that the defendants' sanctions of the plaintiffs' federal fishing permits and assessment of the civil penalties were not supported by the record developed in the administrative proceeding and that prejudicial procedural errors occurred. As explained more fully below, the administrative record provides substantial evidence and explanation supporting the permit sanctions and the civil penalties in a hearing that was properly conducted by the ALJ. The defendants respectfully request that the Court deny the plaintiffs' Motion for Summary Judgment, and that the Court grant the defendants' Motion For Summary Judgment.

## DESCRIPTION OF MOTION

The government seeks summary judgement against the plaintiffs on all claims because substantial evidence supports the Administrative Law Judge's Initial and Modified Decision and Orders.

## STATEMENT OF FACTS

As this is an administrative review case based entirely on an administrative record, there are no material facts outside the 11 volumes of the Administrative Record that were compiled and served on the plaintiffs at the time that the Government filed its Answer to the Complaint on February 1, 2005. It is well-established that in actions seeking judicial review under the APA, the scope of judicial review is properly limited to the administrative record that was before the agency at the time the decisions were made. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Camp v. Pitts, 411 U.S. 138 (1973); Citizens to Preserve Overton Park v. Overton, 401 U.S. 402 (1971); Louisiana Ass'n of

---

increments at the beginning of each fishing year for three consecutive years.

[2]The Initial Decision and Order and Modified Decision and Order Based on Post-Hearing Motions were upheld by the NOAA Administrator in an Order Denying Discretionary Review, dated October 21, 2004 (Vol. V: 184).

Independent Producers v. FERC, 958 F.2d 1101, 1117 (D.C. Cir. 1992); City & County of San Francisco v. United States, 130 F.3d 873, 876 (9th Cir. 1997); Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985) ("[The district court] is not required to resolve any facts in a review of an administrative proceeding. Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."). Thus, there are no material facts for the Court to resolve in the first instance in this action. Rather, the Court's role is limited to determining whether the facts as found by the defendants are reasonable and supported by the record.

Accordingly, the Court is referred to the administrative record cited throughout this brief and the procedural and factual background summary of the administrative proceeding set forth below.

1. The Magnuson-Stevens Act was enacted in 1976 to achieve and maintain the long-term productivity of the Nation's fishery resources. 16 U.S.C. § 1801(b).[3] Under the Magnuson-Stevens Act, the United States exercises jurisdiction over all commercial and recreational fishery resources within the 200 mile Exclusive Economic Zone ("EEZ"). 16 U.S.C. §§ 1811(a) and 1802(6).

2. The Nation's commercial fisheries are managed under the Magnuson-Stevens Act through various Fishery Management Plans ("FMPs") prepared by eight regional fishery management councils established under the Magnuson-Stevens Act. Authority for final approval of FMPs is vested in the Secretary of Commerce, as delegated to the Assistant Administrator for Fisheries of the National Marine Fisheries Service ("NMFS") of the National Oceanic and Atmospheric Administration ("NOAA"). The NMFS is an agency within NOAA. NOAA is an agency within the U.S. Department of Commerce. Id.

3. FMPs contain the councils' guidelines for managing specific fisheries, which in turn are

[3] The Magnuson-Stevens Act was originally titled the Magnuson Fishery Conservation and Management Act, it was amended on October 11, 1996, and renamed the "Magnuson-Stevens Fishery Conservation and Management Act."

implemented through regulations promulgated by NMFS. On behalf of the Secretary of Commerce, NMFS enforces the prohibitions contained in the Magnuson-Stevens Act and the regulations implementing the FMPs developed under the Magnuson-Stevens Act. Id. There are several FMPs and corresponding regulations for the various commercial fisheries of the Northeast Atlantic ocean. See generally 50 C.F.R., Parts 600 and 648.

4. The FMP for the groundfish fishery and implementing regulations were adopted by the New England Fishery Management Council and NMFS in 1986, and have been amended several times. See generally 50 C.F.R. §§ 648.81 – 648.96. The FMP and its implementing regulations were developed to prevent the collapse of groundfish stocks. Id. Key components of the FMP are the vessel/dealer reporting requirements and the Days at Sea (DAS) program. 50 C.F.R. §§ 648.7 and 648.10.

5. A reporting system, such as the one at issue here, assists the Secretary in determining whether a fish stock may be over-fished or may need to be regulated to prevent over-fishing.[4] The reporting requirements require both vessels and dealers to report what fish, the amount of the fish, the price of the fish and the day of catch or purchase, among other items. See 50 C.F.R. § 648.7 (governing reporting requirements in this case). The goal, once the secretary has identified a fishery needing regulation, is for a fishery council to prepare an FMP. 16 U.S.C. § 1854(e)(3).

6. An FMP must include the provisions set forth in 16 U.S.C. § 1853(a). An FMP may include a system to limit access to any fishery in order to achieve optimum yield if the council and the NMFS take certain factors into account. These factors are: (a) present participation in the fishery; (b) historical fishing practices in, and dependence on, the fishery; (c) the economics of the fishery; (d) the capability of

[4]In 1996, Congress passed the Sustainable Fisheries Act (SFA), which amended the Magnuson Act. The SFA added the requirement that FMPs identify and describe essential fish habitat (EFH) based on guidelines to be established by the Secretary, and to "minimize to the extent practicable adverse effects on such habitat caused by fishing." 16 U.S.C. § 1853(a)(7). The reporting system also helps provide information for this purpose as well.

fishing vessels used in the fishery to engage in other fisheries; (e) the cultural and social framework relevant to the fishery and any affected fishing communities; and (f) any other relevant considerations. 16 U.S.C. § 1853(b)(6). Final implementing regulations, once promulgated by the Secretary to effectuate an FMP, have the force and effect of law. 16 U.S.C. §§ 1854 & 1855. See Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1464 (9th Cir. 1987).

7. In addition to requiring reporting that helps to manage fisheries, FMPs use provisions to control the amount of fish harvested in order to obtain an optimum yield. The northeast multispecies fishery employs a fishing effort limitation known as the Days at Sea (DAS) program. The DAS program limits the number of days that a fishing vessel can engage in fishing for a subset of northeast multispecies that includes Atlantic cod, numerous species of flounder, and other fish species, collectively known as "regulated species." 50 C.F.R. § 648.2.[5] Under the DAS program, a vessel may fish for, possess, or land "regulated species" only after having called in to the DAS program. 50 C.F.R. §§ 648.10(c) and 648.14(c)(1).

8. The reporting system and DAS program are supported by a civil enforcement program. It is unlawful for any person to violate any of the Magnuson-Stevens Act's provisions or any regulation issued under the Magnuson-Stevens Act. Magnuson-Stevens Act § 307(1)(A), 16 U.S.C. § 1857(1)(A). Any person who is found by the Secretary, after notice and an opportunity for a hearing, to have committed a prohibited act may be assessed an administrative civil penalty not to exceed $100,000 per violation.[6] Magnuson-Stevens Act § 308(a), 16 U.S.C. § 1858(a). Any person against whom a civil penalty is

---

[5]"*Regulated species* means the subset of NE multispecies that includes Atlantic cod, witch flounder, American plaice, yellowtail flounder, haddock, pollock, winter flounder, windowpane flounder, redfish, and white hake."

[6]Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996 (Pub. L. 104-134), the maximum civil penalty has been increased to $130,000. 65 FR 65260, (November 1, 2000); 69 FR 74416 (December 14, 2004).

assessed may obtain review in the District Court by filing a complaint "within 30 days of the date of such order." Magnuson-Stevens Act § 308(b), 16 U.S.C. § 1858(b); see Picciandra v. Secretary of U.S. Dep't of Commerce, Civ. A. No. 86-2828-MC, 1989 WL 33617 (D. Mass. 1989).

9. The plaintiffs in this action held federal fishing vessel permits for many of the fisheries regulated by NMFS, including northeast multispecies finfish (or "groundfish"). Vol. V: 172, pages 6 and 36; and Vol. IX: J and K.

10. In the afternoon of July 6, 1999, the F/V Dona Maria, a vessel owned and operated by Clarke A. Reposa, Sr., landed at Town Dock Fisheries, Inc. in the port of Galilee, in Narragansett, RI, ending a trip that began on July 3, 1999. Vol. V: 172, pg. 8; Vol. IX: C and O.

11. The F/V Dona Maria offloaded its catch of 32,209 pounds of whiting, 455 pounds of squid, 15 pounds of red hake, 190 pounds of Atlantic cod, 40 pounds of pollock, 330 pounds of blackback flounder (190 extra large sized and 140 medium sized), 755 of yellowtail flounder (85 large, 670 small), and 80 pounds of monkfish (a total of 1,395 pounds of fish). Vol. IV: 154; Vol. V: 161, 165, 172, ppg. 8, 11, 18, and 20-22; and 178, pg. 3; Vol: VII, pg. 21, line 11, through pg. 22, line 10 ("21:11 – 22:10"); 24:7-14; and 65:17-21; and Vol. IX: A, C - F, J - V, X, Z - EE, and KK - WW.

12. The Atlantic cod, pollock, blackback flounder, yellowtail flounder and monkfish were sold to the Sea air Seafood Co., Inc. Vol. V: 172, pg. 9.

13. The F/V Dona Maria was not enrolled in the DAS program for the trip from July 3 through 6, 1999. Vol. V: 172, pg. 8.

14. On August 6, 1999, the National Marine Fisheries Service received the F/V Dona Maria's Fishing Vessel Trip Report (VTR) numbered 8194268, which Reposa signed as the operator of the F/V Dona Maria and submitted to the Agency claiming the F/V Dona Maria caught only 33,000 pounds of silver hake (whiting). Vol. IX: O.

15. The F/V Sister Alice is a fishing vessel owned by Reposa Fisheries, Inc., a closely held Rhode Island corporation whose stock is owned solely by Reposa. Vol. V: 172, pg. 36.

16. On July 5 and 6, 1999, the F/V Sister Alice was operated by Todd Chappell, an experienced fisherman of over 20 years. Vol. V: 172, pgs. 11 and 37.

17. As an experienced fisherman, Todd Chappell knew that 80-100 pounds of fish fit in each fish tote, and he can be expected to provide a reasonably accurate estimate of the weight and identification of fish he has caught. Id.

18. On July 5 and 6, 1999, Todd Chappell made two fishing trips on the F/V Sister Alice, calling in to the DAS program for both trips, and landing in Narragansett, RI. Vol. V: 172: pgs. 11-12. On July 6, 1999, he landed in the morning. Vol. IX: S.

19. Todd Chappell completed two FVTRs numbered 8215251 and 8215252 for the July 5th and 6th trips, respectively. VTR #8215251, signed by Todd Chappell as the operator, reported that the F/V Sister Alice landed on July 5, 1999, a catch consisting of 500 pounds of yellowtail flounder, 500 pounds of blackback flounder, 50 pounds of Atlantic cod, and 11,000 pounds of skate. VTR #8215252, signed by Todd Chappell as the operator, reported that the F/V Sister Alice landed on July 6, 1999, a catch consisting of 200 pounds of yellowtail flounder, 200 pounds of blackback flounder, 50 pounds of Atlantic cod, and 15,000 pounds of skate. Id.; Vol. IX: R and S.

20. On July 10, 1999, in response to a request for the vessel's landing information, Todd Chappell provided both FVTRs to a deputized agent for the National Marine Fisheries Service, Sgt. Longtin, from the Rhode Island Department of Environmental Management. Vol. IX: A, R, and S.

21. In the late afternoon of July 6, 1999, after the F/V Dona Maria landed, SeAir received 13 to 17 totes of fish. The SeAir dealer report submitted to NOAA for that date reported a purchase from the F/V Sister Alice of 190 pounds of Atlantic cod, 40 pounds of pollock, 330 pounds of blackback flounder

(190 extra large sized and 140 medium sized), 755 of yellowtail flounder (85 large, 670 small), and 80 pounds of monkfish (a total of 1,395 pounds of fish). Vol. IX: A, C, T, U, and V.

22. If true, the landing of northeast multispecies by the F/V Sister Alice on both days would have been the largest landings of regulated multispecies by the F/V Sister Alice during the periods between July 6 through August 6 in the past three years. Vol. IV: 172, pg. 12. Vol. IX: C.

23. Reposa Fisheries, Inc. and Reposa employed an accountant, Markarian & Meehan, Ltd., to handle the finances for both the F/V Sister Alice and F/V Dona Maria. The accountant's practice is to complete a settlement sheet for each fishing trip that reflects the amounts paid to the vessel's crew and other trip expenses, advances, and taxes. Vol. IV: 172, pg. 7.

24. On or about July 9, 1999, SeAir made a check for $2,117 payable to the F/V Sister Alice for the northeast multispecies listed on the dealer report and sent that check to Reposa's accountant. Vol. IV: 172, pg. 10.

25. Reposa normally does not take a crew share, but occasionally requests and receives a distribution from the boat's account. Reposa is the only person to whom payments were made from this account from this trip. Vol. IV: 172, pgs. 7, 12-13, and 21.

26. On or about July 14, 1999, the $2,117 SeAir check for the northeast multispecies was deposited into the F/V Sister Alice bank account under the name of Reposa Fisheries, Inc. Vol. IV: 172: pg. 12.

27. On the same day, Reposa's accountant issued a check from Reposa Fisheries, Inc.'s account for half that amount ($1,058) to Reposa. Reposa cashed the check on that day. Vol. VIII: 193: pgs. 10:18–11:2 and 12:22– 13:20; and 194: 20:15-18 and 26:25– 27:1.

28. A settlement sheet outlining the value of the catch and expenses paid for the F/V Sister Alice's trips showed that the $2,117 check for the two trips was split in half. One half, $1,058, was

deducted as the boat's share. The other half, $1,059,[7] was attributed to Reposa as a crew share, despite his not having fished on either of those trips. Vol. IX: D, page 4, ¶ 7; E, pages 2, ¶ 4 and 5, ¶ 3; DD (settlement sheet #56); Vol. VIII: 194, pgs. 14:18–15:1, 30:12-21, 31:13-20, and 47:5-13.

29. On August 12, 1999, Todd Chappell met with National Marine Fisheries Service Special Agents Jachimczyk and McCarron. When the Agents inquired about what was landed on July 5th and 6th, Chappell submitted to the Agents the false FVTRs numbered 8215251 and 8215252, and reiterated that they were true and accurate reports of the F/V Sister Alice's landings on those dates. Vol. IV:172,pg. 13.

30. On August 16, 1999, NMFS received the false FVTRs numbered 8215251 and 8215252 that were submitted and maintained by Todd Chappell. Vol. IV: 172, pg. 13.

## ARGUMENT

I. Summary Judgment Should Be Granted In Favor Of The Defendants Because Substantial Evidence Supports the Administrative Law Judge's Determinations.

A. Standard of Review.

The plaintiffs and defendants each seek summary judgment on the record created by the National Oceanic and Atmospheric Administration (NOAA). In this case NOAA charged the plaintiffs with landing illegally fished for and retained regulated species, submitting false fishing vessel trip reports, and making false written statements to an authorized officer in violation of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). 16 U.S.C. § 1857(1)(A). The ALJ's evaluation of NOAA's case in the administrative proceeding must be based on the whole administrative record or those parts thereof that are supported by and in accordance with the reliable, probative, and

[7] The actual crew share is $1,058.50. The computer program, however, automatically rounds the crew share up to the next whole number if it is 50 cents or higher or down to the next whole number if it is 49 cents or lower. Vol. V: 172, pg. 12, note 12.

substantial evidence. 5 U.S.C. § 556(d). Within this context the burden of proof is on NOAA to prove the counts in the NOVA and the NOPS to the ALJ by a preponderance of the evidence, i.e., that the existence of a fact is more likely than not. Department of Labor v. Greenwich Colleries, 512 U.S. 267 (1994); Steadman v. SEC, 450 U.S. 91, 100-103 (1981); Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602, 622 (1993).

For summary judgment, the Magnuson-Stevens Act incorporates the standard of review as found in the Administrative Procedure Act (APA), 16 U.S.C. § 1858(b). See Northern Wind Inc. v. Daley, 200 F.3d 13 (1st Cir.2003) (Magnuson Act incorporates the standard of the APA); Lobsters Inc. v. Evans, 346 F.Supp.2d 340 (D.Mass.2004) (The court has jurisdiction pursuant to the APA.); Fishing Company of Alaska v. U.S., 195 F.Supp 2d. 1239, 1246 (W.D.Wash. 2002)(In reviewing cross motions for summary judgment, the Court determines, as a matter of law, whether the evidence in the record permitted the agency to make the final decision.) "That standard accords great deference to agency decision-making; the agency's decision is presumed valid, and judicial review is solely to determine whether substantial evidence in the record supports the decision." Northern Wind, Inc. v. Daley, 200 F.3d 13, 17 (1st Cir. 1999); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971); Baltimore Gas & Electric Co. v. Natural Resources Defense Council, 462 U.S. 87, 103 (1983); FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 813-18 (1978); Modern Continental Construction Company, Inc. v. OSHA, 305 F. 3d 43, 47 (1st Cir. 2002); Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

A reviewing court "may not set aside an agency ruling that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." Phoenix-Griffin Group II, LTD. v. Chao, 376 F.Supp.2d 234, 244 (D.R.I. 2005). Unlike the usual summary judgment review in which facts and inferences therefrom are viewed in favor of the nonmoving

party, in a record review case such as this one "[i]t is not proper for [the] court to view the facts in a light favorable to the nonmoving party." Id., at 245. The issue is whether "the agency properly dealt with the facts." Id. This standard does not permit the Court to weigh the evidence but only to determine that the record includes sufficient evidence as "a reasonable mind might accept as adequate to support a conclusion." Steadman v. SEC, 450 U.S. 91, 99 (1981) (citing Consolo v. FMC, 383 U.S. 607, 620 (1966); Bath Iron Works Corp. v. United States Department of Labor, 336 F.3d 51, 56 (1st Cir. 2003); Chritton v. National Transportation Safety Board, 888 F.2d 854, 856 (D.C. Cir. 1989) (Court determines whether the agency "could fairly and reasonably find the facts as it did."); Roche v. Evans, 249 F. Supp. 2d 47 (D. Mass 2003), appeal docketed , No. 04-1251 (1st Cir. Feb. 20, 2004); Roque v. Evans, 2003 WL 131725, *1 (D. Mass.). Last, "[a]n agency conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." Throckmorton v. National Transportation Safety Board, 963 F.2d 441, 444 (D.C. Cir. 1992).

B. Substantial Evidence Supports the ALJ's Determinations.

In general, the plaintiffs' memorandum restates the arguments that the ALJ addressed in his Initial Decision and Modified Decision and Order. Vol. V: 172 and 178. The plaintiffs' motion fails to identify or demonstrate that any part of the Administrative Record which NOAA presented was not relevant, material, reliable, and probative on the charges against the plaintiffs. 15 C.F.R. § 904.251(b). The plaintiffs have also failed to demonstrate that any of the ALJ's findings were not based on substantial evidence that "a reasonable mind might accept as adequate to support a conclusion." Steadman v. SEC, 450 U.S. 91, 99 (1981).

The ALJ found that the plaintiff, Reposa, more likely than not landed the regulated species of groundfish in question from the F/V Dona Maria on July 6, 1999. Vol. V: 172, pgs. 18 and 20-22. The plaintiffs argue that the ALJ's finding is not supported by substantial evidence because it relies on

circumstantial evidence and disregards the testimony of six individuals, three of which were "third-party competent disinterested person direct witnesses." (sic) Plaintiffs' Memorandum in Support of Motion for Summary Judgment, page 5. The plaintiffs' claim relies on a misunderstanding of what constitutes reliable evidence, misstates the nature of the witnesses' testimony, and disregards the ALJ's weighing of that testimony.

The ALJ's reliance on circumstantial evidence over direct evidence is proper. "One of the conventional rules [of civil litigation] is that 'in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence.'" Tyler v. Bethlehem Steel Corporation, 958 F.2d 1176, 1184 (2d Cir. 1983)(quoting United States Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 714 n. 3 (1983)). Moreover, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 508 n. 17 (1957); see Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003)(quoting Rogers and further noting that circumstantial evidence has never been questioned in criminal cases despite the higher burden of establishing facts beyond a reasonable doubt). In this case, the ALJ weighed the highly unusual nature of the landing and sale of the fish, along with the inconsistent, false statements by Clarke A. Reposa, Sr. and Todd Chappell (the two people who were directly involved with the catching and landing the fish), and the reliable documentary evidence showing payment for the fish being made only to Reposa. He found this evidence outweighed the uncorroborated and inconsistent testimony of the plaintiffs' witnesses, some of which he found not to be credible.

The ALJ relied on documentary evidence and testimony that showed what fish was landed (in contrast to what was reported to the NMFS) and who was paid for the landing (in contrast to who the defendants claimed landed the fish). Specifically, the ALJ repeatedly cited to landing records, accounting documents, and Clarke Reposa's accountants' testimony showing that Clarke Reposa was the only one

ever paid for the trip and stated this was "[t]he strongest evidence the fish was most likely landed and sold ... by ... Clarke Reposa of the F/V DONA MARIA...." Vol. V: 172, pgs. 7 (findings 10-11), 8 (finding 17), 9 (finding 21), 10 (findings 26 and 27), 12-13 (findings 36-38), and 21. This was not, however, the only evidence supporting the ALJ's finding. Clarke Reposa's and Todd Chappell's inconsistent and uncorroborated testimony and statements about the landing and reporting of, and payment for, the fish were found not credible.[8] Vol. V: 172, pgs. 8 (finding 17) and 21. The ALJ also specifically noted the unusual nature of the landing had it occurred as the defendants claimed. Vol. V: 172, pgs. 12-13 (findings 33, 34, 35, 38, and 40), and 21.

Other evidence exists in the record as well. For example, the fish in question was delivered to the fish dealer on the afternoon of July 6, 1999, shortly after the F/V Dona Maria landed and offloaded its catch. Vol. IX: A, C, T, U, and V; see Vol. IV: 154, pgs. 3-9. In contrast, the F/V Sister Alice landed on July 5, 1999, and on the morning of July 6, 1999. Vol. IX: R and S. See Vol. IV: 154, pgs. 9-13 (discussing documentary evidence).

The plaintiffs counter that their story was corroborated by the testimony of three third-party direct witnesses (Hawkins, Perry, and Fallon) to the F/V Dona Maria offload who were "disinterested" in the outcome of the matter. These witnesses' testimony, however, was contradicted by the documentary evidence and circumstances of this case, and included numerous inconsistencies and substantial discrepancies. See Vol. V: 161, pgs. 14-20. Additional evidence in the record reveals that these

---

[8]Zhang v. U.S. Immigration and Naturalization Service, 386 F.3d 66, 73-74 (2d Cir. 2004); accord Griessenauer v. Department of Energy, 754 F.2d 361, 364 (Fed. Cir. 1985)("The determination of the credibility of the witnesses is within the discretion of the presiding official who heard their testimony and saw their demeanor."); McFadden v. Barnhart, 2002 WL 31031305 (N.D.Cal. 2002)("Determining credibility is properly the province of the ALJ, who had the opportunity to listen to and observe the [witnesses'] testimony."); Roque v. Evans, 2003 WL 131725, n. 4 (D.Mass.)(stating that the court was "not free to substitute it's judgment..." on the ALJ's rejection of the plaintiff's inconsistent statements as not credible.)

witnesses were not "disinterested" and that the contradictions, inconsistencies and discrepancies were rooted in the witnesses' bias in favor of the plaintiffs. See U.S. v. Canales, 744 F.2d 413, 425 (5th Cir. 1984)(noting that a witnesses' bias or interest in a case may come from an "infinite" number of circumstances and citing familial and employment relationships as an example). Vol. V: 172, pgs. 6-7 (findings 6–8). In this case, Hawkins had a long history of working in partnership with Reposa. Vol. V: 172, pgs. 6-7 (findings 6-8); Vol. IX: F. Fallon worked in the past for Reposa, hoped to return to work for Reposa, and was Reposa's nephew (Vol. VII: 190, pgs. 734:18–735:11 and 737:9-13, and Vol. VII: 191, pg. 973:7-8). Testimony revealed that Perry met with the respondents' counsel the night prior to his testifying (Vol. VII: 190, pg. 704:14-16), was driven to the hearing by the respondents' counsel (Vol. VII: 190, pg. 719:1-8), and had lunch with Reposa (Vol. VII: 190, pg. 719:9-13). This testimony is of particular importance in light of Perry's reluctance to testify truthfully if it hurt the plaintiffs (Vol. VII: 189, pgs. 721:8–722:3; Vol. VIII: 192, pgs. 1056:11-1061:5; and see Vol. V: 161, pgs. 18-19).[9] Further, the ALJ particularly noted that Hawkins and Perry testified that they "did not recall" observing groundfish being offloaded, not that groundfish were not landed and offloaded. Vol. V: 172, pg. 8 (finding 15). Weighing the totality of the evidence, the ALJ found that the accountants' testimony and documentary evidence were more credible and reliable. Vol. V: 172, pgs. 20-21. It is reasonable for the ALJ to rely on documentary evidence in the face of questionable, inconsistent, or false statements.

In arguing that they insubstantially misestimated their catch, the plaintiffs incorrectly assert that the ALJ rejected their expert witness' uncorroborated and unimpeached testimony. To the extent that the plaintiffs argue that the trip reports were only estimates, they misstate the agency's regulatory requirements. The plaintiffs were required by the regulations to make "accurate" fishing reports that

---

[9]According to one of the plaintiffs' attorneys, prior to Perry's meeting with Attorney Bergersen, Perry couldn't even remember if he worked on July 6, 1999. Vol. VII: 189, pg. 284:6-15.

included the pounds, by species, of all fish landed or discarded, not "estimate" their catch. 50 C.F.R. § 648.7(b)(1)(i)(Oct. 1, 1998).[10]

The requirement for accurate reporting was not made in a vacuum, but developed out of the years of fishing experience and reporting required of fishermen.[11] For example, Todd Chappell testified that he uses fish totes. Vol. VIII: 191, pgs. 823:22–826:23. Fish totes are standard measurement devices, defined by NOAA's regulations as designed to hold 100 pounds of fish. 50 C.F.R. § 648.2. The ALJ found that based on this and other evidence, Todd Chappell could accurately estimate his catch.[12] Vol. V:

---

[10]The regulations were later changed to require a "hail weight" from vessel operators. Hail weight is defined as a "good faith estimate." 65 FR 60892-60896 (Oct. 13, 2000) Nevertheless, the ALJ found that in light of Chappell's considerable fishing experience and method of packing fish in a standard fish tote that is designed to hold a certain weight of fish, the plaintiffs' reports and statements were not estimates made in good faith, but were false statements intended to cover up an illegal landing.

[11]The vessel reporting requirements were implemented in 1994. 59 FR 9884 (Mar. 1, 1994).

[12]In Lobsters, Inc. v. Evans, 346 F.Supp.2d 340 (D.Mass. 2004), the court ruled that the vessel captain's oral statements to authorized officers were not false statements because he was providing an opinion of the weight of his catch "and the record does not contain substantial evidence suggesting [the captain] intentionally understated the quantity of scallops on deck." Unlike in Lobsters, the false statements here were not estimates. The regulations require reports to be accurate. 50 C.F.R. § 648.7(b)(1)(i). Even if good faith estimates were allowed, however, as the regulations now allow (see 65 FR 60892-60896 (Oct. 13, 2000), the ALJ found that the plaintiffs intentionally tried to cover up the illegal landing with false reports and false statements. Vol. V: 178, pg. 3. There is substantial evidence to support that finding. First, Chappell told NMFS Agents McCarron and Jachimczyk that the reports accurately reflected the landings, taking pride in his accuracy. Vol. V: 172, pg. 13 (finding 39) and Vol. IX: C. Second, the ALJ found that the fish reported by Chappell as coming from the F/V Sister Alice and omitted by Reposa in the F/V Dona Maria report didn't come from the F/V Sister Alice at all, but came from the F/V Dona Maria. Vol. V: 172, pgs. 18, 20-22. Third, the discrepancies in the reports were so substantial that the ALJ concluded that they couldn't be good faith estimates. Vol. V: 172, pg. 18. Based on all of the evidence, the ALJ stated that the defendants "willfully violated the Magnuson-Stevens Act and then attempted to cover their wrongdoings." Vol. V: 172, pg. 23. The ALJ further found that "by filing ... VTR(s) containing false or inaccurate information to cover up the F/V DONA MARIA's landing of regulated species while not called into the Days-At-Sea program and conspiring with Clarke Reposa, Sr. to evade detection, the [plaintiffs] directly impeded the Agency's ability to carry out its responsibilities under the Magnuson-Stevens Act." Vol. V: 178, pg. 2. The agency's reporting system is critical to effective fishery management. In re Matsubun Gyogyo Co., Ltd., 2 O.R.W. 466, (NOAA 1981). The agency's interpretation of what constitutes a good faith estimate of fish catch in particular given the use of standard fish totes should be accorded deference.

172, pgs. 11 (finding 28) and 18; see United States v. Hartness, 845 F.2d 158 (8th Cir. 1988) cert. denied 488 U.S. 925 (1988)(ruling that an estimate can form the basis of a false statement charge under 18 U.S.C. § 1001). He further found that omitting species of fish altogether and grossly over- and under-reporting was not a good faith estimate, but a substantial discrepancy that evidences a willfull false report, especially when the only person who was paid for this trip was Clarke Reposa. Vol.V: 172, pgs. 11 (finding 28), 18, and 23.

Second, the plaintiffs' expert was contradicted and impeached. The defendants presented their own analysis that was more rigorous and fair. Vol. VII: 189, pgs. 160:11-163:9 and 349:12-355:17; Vol. VII: 190, pgs. 601:22-24, 603:23–604:15, 604:16–605:7, 607:2–610:24. The plaintiffs' witness was cross-examined, during which it was revealed that his analysis was faulty. Specifically, it was shown that he minimized discrepancies (for example, overreporting one species by 300 pounds and underreporting another species by 300 pounds would be considered accurate reporting by his analysis, despite the difference in fish species) versus stating the full error (in the example given, the cumulative error would be 600 pounds, which accounts for the misreporting of fish species[13]), not accounting for different fishing locations, not accounting for seasonal variations, and not accounting for the data in Chappell's personal fishing logbook. Id., and Vol. X: 196, Ex. 1, table 4. Particularly because of his using an absolute value versus cumulative error analysis, the ALJ rejected the expert's testimony as not being credible. Vol. V: 172, pg. 18, n. 14.

Third, the plaintiff's expert was qualified "as an expert in the area of marine fisheries as it relates to the operation and practices of the Point Judith Rhode Island fleet." Vol. VII: 190, pg. 589:10-19. He was not qualified as an expert on proper vessel reporting. He was not qualified on the ability of a

[13]Prof. DeAlteris acknowledged the importance of accurately reporting species caught during cross-examination. He agreed that fishery managers develop FMPs for particular fish species and that "they are dependent upon reported landings for the individual species." Vol. VII: 190, pg. 610:11-21.

fisherman to accurately estimate his catch.

The plaintiffs argue that the ALJ's decision is flawed because the ALJ relied solely on hearsay evidence. "Hearsay evidence is admissible in an ALJ hearing under the APA." Stillufsen v. Evans, 2005 WL 2175441, *8, n. 1 (D.N.J.)(citing 5 U.S.C. § 556(d) and Richardson v. Perales, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The important issue is whether the evidence is reliable. See Roque v. Evans, 2003 WL 131725, *2 (D.Mass.)(quoting Calhoun v. Bailar, 626 F.2d 145, 148 (9th Cir. 1980) and finding that dealer reports were sufficiently reliable). The most significant evidence relied on by the ALJ was the accountant's records and testimony and the vessel and dealer reports submitted to the agency, the trustworthiness of which was unquestioned by the defendants.

II. Summary Judgment Should Be Granted In Favor Of The Defendants Because The ALJ's Decision Is Consistent With Current Law.

The plaintiffs claim that the ALJ's legal conclusion is contrary to law or precedent because he allowed the defendant Clarke Reposa to be impeached improperly through testimony and a report of Reposa's prior encounter with Rhode Island Department of Environmental Management officers as included in Agency's Exhibit KK.[14] Plaintiffs' Summary Judgment Memorandum, page 9. There is no indication in the ALJ's Decision or Modified Order that the ALJ relied at all on Agency's Exhibit KK to impeach Mr. Reposa. Thus, even if it was error to admit Agency Exhibit KK into evidence, it was harmless error. See General Dynamics Co., Quincy Shipbuilding Division v. Occupational Safety and Health Review Commission, 599 F.2d 453, 463 (1st Cir. 1979)(holding that the Review Commission's errant rejection of the ALJ's credibility determinations was harmless error because "[n]owhere in its decision did the Review Commission rely upon [the witnesses'] testimony.").

---

[14]The plaintiffs also support their argument by referring to the ALJ's ruling concerning a third-party, David Barbera. Mr. Barbera is not a named party to this proceeding. There is no evidence that the ALJ considered Barbera's destruction of the 3x5 card as evidence against the plaintiffs.

III. Summary Judgment Should Be Granted In Favor Of The Defendants Because The ALJ's Imposition Of Civil Penalties And Permit Sanctions Is Supported By Substantial Evidence And The Agency's Definition Of Its Own Regulations Is Proper.

The plaintiffs contend that the penalties are unwarranted because of their inability to pay evidence presented at the hearing. Plaintiffs' Summary Judgment Memorandum, page 10. The burden of proving an inability to pay the assessed penalties rests on the plaintiffs. 16 U.S.C. § 1858(a). The ALJ weighed the financial evidence provided by the plaintiffs and found that Clarke Reposa and Reposa Fisheries, Inc. failed to prove they have an inability to pay the assessed penalties.[15] Vol. V: 172, pgs. 23-24. He further found that any showing of a limited ability to pay by any respondent was not controlling given the seriousness of the violations and the agency's regulations that allow civil penalties to be imposed even if they "would cause or contribute to the bankruptcy or other discontinuation of the respondent's business." Id. 23 and 24, citing 15 C.F.R. § 904.108(d); see also Vol. V: 178, pgs. 2-3 (noting the intentional, serious, and egregious nature of the violations requiring the assessed penalties and permit sanctions).

The plaintiffs claim that the agency's prohibition against the plaintiffs making false statements and its concomitant application of civil penalties is too stringent. The agency holds that its reporting system is critical to good fish management. In re Atlantic Spray et al., 1996 WL 1352603, at *38 (NOAA 1996), quoting In The Matter Matsuban of Gyogo, 2. O.R.W. 466, 474 (NOAA 1981)(holding that "[m]islogging violations cause substantial harm to the fishery resource management goals of the Nation. Accurate and truthful reporting of fishing vessels is the foundation upon which the entire regulatory program is built."). The plaintiffs' violations were serious because they struck at the integrity of the reporting system. The plaintiffs also circumvented the DAS controls. The DAS program is central to the agency's attempt to restore depleted groundfish stocks. See In re Atlantic Spray et al., 1996 WL 1352603, at *12-16, 38-41

[15]The ALJ found that Chappell had a limited ability to pay the assessed penalty, but that in accordance with NOAA's regulations, that factor was not dispositive. Vol. V: 172, pg. 23.

(NOAA 1996)(discussing the multispecies FMP and the importance of the implemented DAS controls and accurate reporting). Moreover, the ALJ noted that the violations were willful and involved numerous individuals in a failed cover up attempt.

IV. Summary Judgment Should Be Granted In Favor Of The Defendants Because No Prejudicial Procedural Errors Occurred.

The plaintiffs aver that the impeachment of Clarke Reposa, Sr. was improper because it included a reference to a charge involving a third-party that was later dismissed. They also claim that cross-examination about financial issues was improperly broad. Last, they argue that the agency's analysis of the documentary evidence was improper because it compiled data in a prejudicial manner. All of the testimony and evidence was relevant and probative. Accordingly, it was properly admitted. Although it was entered into the record, there is no indication anywhere in his decisions that the ALJ relied on any of the information. Therefore, even if admitting the evidence was improper, it was harmless error. General Dynamics Co., Quincy Shipbuilding Division v. Occupational Safety and Health Review Commission, 599 F.2d 453, 463 (1st Cir. 1979).

The financial evidence referred to by the plaintiffs (settlement sheets for the F/V Sister Alice and F/V Dona Maria from 6/6/99 - 8/19/99 (Vol. IX: QQ and RR), F/V Dona Maria expense and payroll checks (Vol. IX: SS), disbursement sheets for the F/V Dona Maria from 7/1/99 - 8/20/99 (Vol. IX: TT), F/V Sister Alice receipts from 6/1/99 - 8/27/99 (Vol. IX: UU), Reposa Fisheries, Inc. check to Reposa (Vol. IX: VV), and F/V Sister Alice disbursement records from 7/6/99 - 8/13/99 (Vol. IX: WW)) was the subject of a subpoena issued early in the case by the ALJ to Reposa's accountants. Vol. I: 14.[16] The

---

[16]The subpoena required the accountants to produce "[a]ny and all original business records for F/V Dona Maria and F/V Sister Alice ... pertaining to the purchase, sale, trade, transfer, settlement, and acquisition of any fish or fish products for the period from June 15, 1999, to August 16, 1999." Vol. I: 14. It also specifically demanded "payroll records, financial records, ... and other documents reflecting payments to or from ... said vessels and/or corporations." Id. It was signed February 9, 2001. Id. The basis for the subpoena was not to analyze the plaintiffs' financial condition. Rather, the information was

information was not provided to the agency until the last weekend before the hearing. Vol. VIII: 192, pgs. 1073-1076. It should have been provided in response to the earlier subpoena and would not have been subject to any alleged privilege or seal. In any case, the evidence in question is relevant and probative as to violations charged and should not be subject to any unidentified privilege.

The plaintiffs argued to the ALJ that the information sought by the Agency was protected under the Privacy Act (5 U.S.C. § 552a) and the Trade Secrets Act (16 U.S.C. § 1905). Their citations were too broad and vague to be meaningful. The Privacy Act protects documents kept in a system of records by the government, unless the documents fall under an enumerated exception. See 5 U.S.C. § 552a(b). The documents sought by the subpoena, however, were under the respondents' control or possession. If the documents were potentially protected by the Privacy Act, they fall under a "routine use" exception that allows otherwise protected documents to be used for law enforcement purposes. Likewise, the plaintiffs failed to show any basis for protection under the Trade Secrets Act. The Trade Secrets Act seeks to protect documents the release of which could irreparably damage a businesses' viability. The plaintiffs have failed to identify specific documents or indicate what damage their release would cause to the business' viability.

---

required because it was relevant to the charges issued against the plaintiffs. Vol. I: 9, 12, and 13.

CONCLUSION

For the reasons stated above, the plaintiffs' summary judgment motion should fail. Because there is substantial evidence to support the ALJ's decision, summary judgment should be granted in favor of the defendants.

Respectfully submitted,

UNITED STATES OF AMERICA

By its attorneys,

ROBERT CLARK CORRENTE
United States Attorney

MICHAEL P. IANNOTTI
Assistant U.S. Attorney

Of Counsel:

J. Mitch MacDonald, Esq.
NOAA Office of General Counsel
One Blackburn Drive
Gloucester, MA 01930
978-281-9379

CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of November 2005, I caused a copy of the foregoing **GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT** and supporting memorandum of law to be forwarded, by regular mail, to:

Leonard L. Bergersen, Esq.
1070 Kingstown Road
Peace Dale, RI 02883