UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CLARKE A. REPOSA, SR. (F/V DONA MARIA), TODD CHAPPELL, and REPOSA FISHERIES, INC. (F/V SISTER ALICE), Plaintiffs, | : | |
| v. | : | CA 04-494 S |
| THE UNITED STATES OF AMERICA, acting by and through DONALD L. EVANS, in capacity as SECRETARY OF COMMERCE, and CONRAD C. LAUTENBACHER, Jr., in capacity as UNDERSECRETARY OF COMMERCE AND NOAA ADMINISTRATOR, Defendants. | : | |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court are cross motions for summary judgment: Plaintiffs' Motion for Summary Judgment (Document ("Doc.") #4) and the Government's Motion for Summary Judgment (Doc. #15). These motions have been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was held on November 28, 2005. For the reasons stated herein, I recommend that Plaintiffs' motion be denied and that the Government's motion be granted.

**I. Introduction**

This is an action for judicial review of administrative proceedings pursuant to the Administrative Procedures Act ("A.P.A."), 5 U.S.C. §§ 701-706, and 16 U.S.C. § 1858(b).[1] See

[1] 16 U.S.C. § 1858(b) provides that:

> **Any person against whom a civil penalty is assessed** under subsection (a) of this section **or against whom a permit**

SCANNED

Complaint (Doc. #1) at 4-6. Plaintiffs were charged by the National Oceanic and Atmospheric Administration ("NOAA" or the "Agency") with illegally landing regulated species of groundfish, submitting false reports, and making false statements. See Volume ("Vol.") V, Exhibit ("Ex.") 172 (Initial Decision and Order ("Initial Decision")) at 3-4.[2] After a hearing, an administrative law judge ("ALJ") found that the violations had been proven, see Initial Decision at 18-19, 21-22, and imposed penalties in the form of fines and permit sanctions, see id. at 25.[3]

---

> **sanction is imposed** under subsection (g) of this section (other than a permit suspension for nonpayment of penalty or fine) **may obtain review thereof in the United States district court** for the appropriate district by filing a complaint against the Secretary in such court within 30 days from the date of such order. The Secretary shall promptly file in such court a certified copy of the record upon which such violation was found or such penalty imposed, as provided in section 2112 of Title 28. The findings and order of the Secretary shall be set aside by such court if they are not found to be supported by substantial evidence, as provided in section 706(2) of Title 5.

16 U.S.C. § 1858(b) (bold added).

[2] The decision of the Administrative Law Judge ("ALJ") is contained in two documents: the Initial Decision and Order ("Initial Decision"), see Volume ("Vol.") V, Exhibit ("Ex.") 172, and the Modified Decision and Order Based on Post-Hearing Motions ("Modified Decision"), see id., Ex. 178. Hereafter, for brevity these two documents are cited as "Initial Decision" and "Modified Decision" without volume and exhibit numbers.

[3] The ALJ's twenty-six page (without attachments) Initial Decision contains three minor typographical errors. The ALJ twice cites to 50 C.F.R. § 648.24(a)(3) and (4) when it is apparent that the intended citation is § 648.14(a)(3) and (4). See Initial Decision at 22 ("Reposa's failure to include the ground fish on his FVTR [Fishing Vessel Trip Report] constitutes a violation of 50 C.F.R. §§ 648.24(a)(3) and (4)."); id. ("Chappell and Reposa Fisheries violated 50 C.F.R. §§ 648.24(a)(3)and (4) as alleged in Count 3 of the NOVA [Notice of Violation and Assessment of Administrative Penalty] and NOPS [Notice of Permit Sanction]."). It is clear that the ALJ intended to cite to 50 C.F.R. § 648.14(a)(3) and (4) because § 648.14

## II. Regulations

The Magnuson-Stevens Fishery Conservation and Management Act (the "Magnuson-Stevens Act" or the "Act"), as amended and codified at 16 U.S.C. §§ 1801-1883, allows the Secretary of Commerce to approve, implement, and enforce Fishery Management Plans ("FMPs") "to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability" of American fisheries. 16 U.S.C. § 1853(a)(1)(A); see also Duckworth v. United States, No. 05-145 S, 2006 WL 753081, at *1 (D.R.I. Mar. 22, 2006)(quoting 16 U.S.C. § 1853(a)(1)(A)). To this end, regulations have been adopted which require owners and operators of fishing vessels to comply with certain fishing limitations, including reporting requirements and the Days at Sea ("DAS") program.[4] See 50 C.F.R. §§ 648.7, 648.10; see also 16 U.S.C. § 1853(a)(5) (requiring FMP to specify, inter alia, catch by species in numbers of fish or weight thereof); id. § 1853(b)(6) (authorizing FMP to establish a limited access system for the fishery); id. § 1881c(b) (requiring the Secretary to develop a strategic plan for fisheries research which, inter alia, provides for the collection of information

---

is cited in the corresponding Notice of Violation and Assessment of Administrative Penalty ("NOVA") and Notice of Permit Sanction ("NOPS") and pertains to violations alleged in the two counts at issue. See Vol. I, Ex. 1 (NOVA), 2 (NOPS). Similarly, the ALJ cites to FVTR "#8215241," Initial Decision at 17, when it plain that he intends to refer to FVTR #8215251, see Vol. IX, Agency ("Ag.") Ex. R (FVTR for F/V SISTER ALICE); see also Vol. I, Ex. 1 at 2. In citing to the Initial Decision, this Court treats that document as if the intended citations appeared therein.

[4] The Days at Sea ("DAS") program limits the number of days that a fishing vessel can engage in fishing for a subset of northeastern multispecies that includes Atlantic cod, numerous species of flounder, and other fish species, collectively known as "regulated species." 50 C.F.R. § 648.2. Under the DAS program, a vessel may fish for, possess, or land "regulated species" only if it has called in to the DAS program. 50 C.F.R. §§ 648.10(c), 648.14(c)(1).

concerning fishing activities and catch); Duckworth v. United States, 2006 WL 753081, at *1 (noting that regulations may be adopted that require operators of fishing vessels to, inter alia, obtain permits and limit the amount or species of fish that are harvested from the sea).

**III. Facts**

Plaintiff Clarke A. Reposa, Sr. ("Reposa"), is the owner and operator of the F/V DONA MARIA. See Vol. VI, Ex. 188 at 7.[5] He also owns Plaintiff Reposa Fisheries, Inc. ("Reposa Fisheries"), a Rhode Island corporation, which, in turn, owns the F/V SISTER ALICE. See Vol. VI, Ex. 188 at 8-9. The F/V SISTER ALICE was operated during the relevant period of time by Plaintiff Todd Chappell ("Chappell"). See id. at 9.

From July 3 through July 6, 1999, the F/V DONA MARIA was engaged in a fishing trip for which the targeted species was whiting. See id. at 8. During this trip, the vessel was operated by Reposa. See id. The F/V DONA MARIA had not called into the National Marine Fisheries Service ("NMFS") DAS program to indicate that she was fishing for northeast multispecies and, therefore, was not permitted to land such species. See id.

On July 6, 1999, the F/V DONA MARIA landed and offloaded approximately 32,000 pounds of whiting and, according to the Agency, at least 560 pounds of northeast multispecies. See Vol. IV, Ex. 154 (Agency's Initial Brief) at 3; see also Vol. III, Ex. 92 (Notice of Violation and Assessment of Administrative Penalty ("NOVA") against Reposa); Vol. IX, Ex. 195, Tab U (Seair Seafood

---

[5] The transcript of the hearing before the ALJ is contained in Volumes VI through VIII of the record. The hearing lasted five days, and each day's testimony has a separate exhibit number. Thus, the Court cites to the transcript by volume, exhibit, and page. For example, a citation to page 882 of the transcript appears herein as: Vol. VIII, Ex. 191 at 882.

Dealer Report).[6] The Fishing Vessel Trip Report ("FVTR") which Reposa signed and submitted to the Agency in connection with this trip only reflected the whiting catch. See Vol. IV, Ex. 154 (Agency's Initial Brief) at 3; see also Vol. IX, Ex. 195, Tab O (FVTR for F/V DONA MARIA for 7/6/99 landing).

On July 5 and 6, 1999, the F/V SISTER ALICE made two fishing trips with Chappell as the operator. See Vol. VII, Ex. 190 at 753, 755, 757. The F/V SISTER ALICE had called into the DAS Program and reported that she was fishing for northeast multispecies during these trips. See Vol. VI, Ex. 188 at 9. Chappell completed two FVTRs for these trips. See id.; see also Vol. IX, Ex. 195, Tab R (FVTR for F/V SISTER ALICE for 7/5/99 landing), Tab S (FVTR for F/V SISTER ALICE for 7/6/99 landing). In the FVTRs, Chappell reported landing 26,000 pounds of skate and 1500 pounds of northeast multispecies (groundfish). See Vol. IX, Ex. 195, Tab R, Tab S. The groundfish consisted of 100 pounds of cod, 700 pounds of blackback flounder, and 700 pounds of yellowtail flounder. See Vol. IX, Ex. 195, Tab R, Tab S.

On July 6, 1999, Sergeant Michael Longtin of the Rhode Island Department of Environmental Management ("DEM") received a telephone tip that the F/V DONA MARIA had landed 17 totes of flounder without having called into the DAS program. See Vol. VI, Ex. 188 at 69, 82, 84; see also Vol. IX, Ex. 195, Tab A (Witness Statement of Sergeant Longtin). An investigation by the

---

[6] The Agency's exhibits are contained in Vol. IX and are collectively designated as Ex. 195. They are individually labeled as Agency Exhibits A through WW. Reposa's exhibits are contained in Vol. X, collectively designated as Ex. 196, and individually labeled 1 through 4. Chappell's and Reposa Fisheries' exhibits are also contained in Vol. X, collectively designated as Ex. 197, and individually labeled 1 through 10. All exhibits individually labeled are located at tabs which correspond to their letter or number. Thus, the Court cites to these exhibits by volume, exhibit, and tab. For example, Agency Ex. U is cited as Vol. IX, Ex. 195, Tab U. Reposa Ex. 3 is cited as Vol. X, Ex. 196, Tab 3.

DEM and the NMFS followed. See Vol. VI, Ex. 188 at 158. On July 10, 1999, Chappell submitted to Sergeant Longtin the two FVTRs for the July 5 and 6, 1999, trips by the F/V SISTER ALICE, reflecting the landing of skate and groundfish in the quantities stated above. See Vol. VI, Ex. 188 at 69, 121; see also Vol. IX, Ex. 195, Tab A (Witness Statement of Sergeant Longtin) at 2, Tab R, Tab S. On August 12, 1999, Chappell told NMFS Special Agents ("SA") Chris McCarron and Louis Jachimczyk that the two FVTRs accurately reflected the amount of fish landed from the F/V SISTER ALICE on July 5 and 6, 1999. See Vol. VI, Ex. 188 at 156; Vol. IX, Ex. 195, Tab C (Investigation Report of SA McCarron) at 5.[7]

Upon completion of the investigation, the Agency concluded that the northeast multispecies in question had actually been landed by Reposa in the F/V DONA MARIA and not by Chappell in the F/V SISTER ALICE. As a result, Reposa was charged with illegally landing groundfish in violation of 50 C.F.R. § 648.14(c)(1)[8] (Count 1) and with failing to include the groundfish on his FVTR,

---

[7] The investigation report of Special Agent ("SA") McCarron is numbered pages 2-12. See Vol. IX, Ex. 195, Tab C. There is no page 1. When citing to this document, the Court uses the report's pagination.

[8] 50 C.F.R. § 648.14(c) provides in relevant part that:

> **[I]t is unlawful for any owner or operator of a vessel** issued a valid limited access multispecies permit or a letter under § 648.4(a)(1)(i)(M)(3), unless otherwise specified in § 648.17, **to do any of the following:**
>
> > (1) Fish for, possess at any time during a trip, or **land** per trip more than the possession limit of **NE multispecies** specified in § 648.86(d) after using up the vessel's annual DAS allocation or **when not participating in the DAS program** pursuant to § 648.82, unless otherwise exempted under § 648.82(b)(5) or § 648.89.

50 C.F.R. § 648.14(c) (bold added).

a violation of 50 C.F.R. § 648.14(a)(3) and (4) (Count 2).[9] See Vol. III, Ex. 92 at 4. Reposa Fisheries and Chappell were each charged with three counts: 1) making a false statement in violation of 50 C.F.R. § 600.725(i)[10] based on Chappell's submission of the FVTRs to Sergeant Longtin on July 10, 1999, (Count 1); 2) making a false statement in violation of 50 C.F.R. § 600.725(i) based on Chappell's August 12, 1999, statement to NMFS SA McCarron and SA Jachimczyk that the two FVTRs accurately reflected the amount of fish landed from the F/V SISTER ALICE on July 5 and July 6, 1999 (Count 2); and 3) submitting a false statement to the NMFS on August 16, 1999, in the form of the two FVTRs reflecting that F/V SISTER ALICE had landed northeast multispecies in the quantities stated on the FVTRs (Count 3). See Vol. I, Ex. 1 (NOVA against Reposa Fisheries and Chappell). Reposa Fisheries was deemed to be vicariously liable for the violations committed by Chappell. See Initial Decision at 19;

---

[9] 50 C.F.R. § 648.14(a) provides in relevant part:

> (a) [I]t is unlawful for any person to do any of the following:
>
> ....
>
> (3) Make any false statement in connection with an application, declaration, or report under this part.
>
> (4) Fail to comply in an accurate and timely fashion with the log report, reporting, record retention, inspection, and other requirements of § 648.7, or submit or maintain false information in records and reports required to be kept or filed under § 648.7.

50 C.F.R. § 648.14(a).

[10] 50 C.F.R. § 600.725(i) makes it unlawful for any person to "[m]ake any false statement, oral or written, to an authorized officer concerning the taking, catching, harvesting, landing, purchase, sale, offer of sale, possession, transport, import, export, or transfer of any fish, or attempts to do any of the above." 50 C.F.R. § 600.725(i).

see also Vol. I, Ex. 1 at 3.

The ALJ found that each of the charges against the Plaintiffs had been proven. See Initial Decision at 18-19, 21-22. He imposed the following penalties: a $40,000 civil penalty against Reposa; a $45,000 civil penalty jointly and severally against Chappell and Reposa Fisheries, respectively the operator and the owner of the F/V SISTER ALICE; ninety day suspensions of the two vessels' fishing permits; and ninety day suspensions of Chappell's and Reposa's operator permits. See id. at 25; see also Modified Decision and Order Based on Post-Hearing Motions ("Modified Decision") at 5.

**IV. Travel**

The ALJ issued his Initial Decision on June 11, 2003. On August 13, 2003, he issued his Modified Decision.[11] Plaintiffs filed their Complaint in this Court on November 19, 2004. Plaintiffs' Motion for Summary Judgment was filed on September 7, 2005, and the Government's Motion for Summary Judgment was filed on November 2, 2005. The Court conducted a hearing on the motions for summary judgment on November 28, 2005, and thereafter took the matter under advisement.

**V. Standards of Review**

District Judge William E. Smith of this Court has recently stated the applicable standards of review in a fisheries case:

> Pursuant to the Administrative Procedures Act, courts

---

[11] The Modified Decision changed the Initial Decision in two respects. First, it added the ninety day suspension of the F/V SISTER ALICE's federal fishing permit, which through oversight had been omitted from the Initial Decision, and it specified that the suspension could be spread over a three year period (thirty consecutive days each year). See Modified Decision at 2-3. Second, the Modified Decision stated that the ninety day suspension of Todd Chappell's operator's permit, which was specified in the Initial Decision, could likewise be spread over a three year period. See id. at 3, 5. The ninety day suspension of Reposa's federal fishing permit was left unaltered. Id. at 3.

> reviewing final agency decisions must hold unlawful and set aside decisions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's findings of fact and decisions concerning a civil penalty will be set aside if not supported by substantial evidence in the record. See 16 U.S.C. § 1858(b); 5 U.S.C. § 706(2)(E). Substantial evidence means such relevant evidence as "a reasonable mind might accept as adequate to support a conclusion." Steadman v. SEC, 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). Under this standard, agency determinations are presumed valid and courts must afford great deference to the administrative decision-making process. See Northern Wind, Inc. v. Daley, 200 F.3d 13, 17 (1st Cir. 1999). Moreover, the ALJ has considerable discretion to draw inferences and make credibility determinations, and courts "may not disturb [the ALJ's] judgment and the [agency's] endorsement of it so long as the findings are adequately anchored in the record." Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 56 (1st Cir.2003). While questions of law require greater scrutiny, courts must give "substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).
>
> Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Cross-motions for summary judgment "do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir.2001) (citation omitted).

Duckworth v. United States, No. 05-145 S, 2006 WL 753081, at *2 (D.R.I. Mar. 22, 2006)(alterations in original). This Court applies the above standards to the instant Motions.

## VI. Plaintiffs' Claim of Errors[12]

### A. Regulatory Violations

#### 1. Existence of Substantial Evidence

Plaintiffs challenge the ALJ's finding that the groundfish at issue were landed by Reposa of the F/V DONA MARIA and not by Chappell of the F/V SISTER ALICE. See Plaintiff's [sic] Clarke A. Reposa, Sr., Todd Chappell and Reposa Fisheries, Inc.'s Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Mem.") at 4-5; see also Initial Decision at 18 (making such finding). Plaintiffs note that the only direct evidence presented at the hearing relevant to the source of the groundfish was the testimony of Steven Duncan, whose testimony the ALJ found not to be credible. Plaintiffs' Mem. at 4 (citing Initial Decision at 20). The balance of the evidence, in Plaintiffs' view, was largely hearsay and so lacking in quality that the ALJ's finding of fact cannot be deemed to be supported by substantial evidence. Id. Indeed, Plaintiffs charge that "[t]he majority of the Agency['s] case consisted of 'investigative reports' containing rank hearsay, uncorroborated and conclusory statements attributed to various parties, which were directly contradicted by the testimony elicited at hearing from the respondents, from disinterested witnesses, and in many instances on cross-examination, even by the authors of the various reports themselves." Plaintiffs' Mem. at 8 (citations to

---

[12] Although Plaintiffs denominate (either by letter or number) ten errors, see Plaintiff's [sic] Clarke A. Reposa, Sr., Todd Chappell and Reposa Fisheries, Inc.'s Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Mem.") at 4-15, their arguments regarding these errors overlap, see, e.g., id. at 4, 8 (complaining about hearsay testimony); id. at 10, 12 (alleging improper impeachment of Clarke A. Reposa ("Reposa") and erroneous admission of Agency Ex. KK); id. at 9, 15 (alleging improper use of Plaintiffs' financial records); id. at 13, 15 (complaining about Agency attachments to post hearing filings (Ex. QQ-WW)). The Court has consolidated Plaintiffs' arguments, and thus they are addressed in fewer sections.

transcript omitted). Thus, Plaintiffs dispute that the evidence satisfies "the legally required 'more probable than not' finding ...." Id. at 9.

The ALJ recognized that, by finding the testimony of Duncan not to be credible, proof of the allegation that the fish in question had been landed by the F/V DONA MARIA depended solely upon circumstantial evidence. See Initial Decision at 20. He acknowledged that this made determining the source of the groundfish "particularly difficult." Id. Nevertheless, the ALJ concluded that the weight of the evidence viewed in its totality supported the Agency's contention. See id. at 20-21. First, he cited the contemporaneous financial records and testimony of the staff accountants at Markarian and Meehan ("M&M"), the firm which provided accounting services to Reposa and Reposa Fisheries, regarding who received payment for the fish. See id. at 21; see also Vol. VIII, Ex. 191 at 882-83. Although Seair Seafood, Inc. ("Seair"), the purchaser of the groundfish in question, issued a check in the amount of $2,117 payable to the F/V SISTER ALICE, the financial records show that only Reposa received a share from the proceeds before the Settlement Sheet was even completed. See Initial Decision at 21 (citing Vol. IX, Ex. 195, Tab V (Seair check), Tab DD (M&M Settlement Records for F/V SISTER ALICE), Tab QQ (M&M Settlement Records #38-59 for F/V SISTER ALICE), Tab VV (Reposa Fisheries, Inc. Check #1028), Tab WW (M&M Disbursement Journal for F/V SISTER ALICE); Vol. VIII, Ex. 194 (Deposition ("Depo.") of Cathy Clark) at 14-16, 19-20, 31, 33). The ALJ accurately noted that the payment of Reposa, instead of Chappell and his crew, who Plaintiffs claim landed the groundfish at issue, was unusual and inconsistent with the accounting practices at M&M. See id. (citing Vol. IX, Tab E (Supplement to Offense Investigation Report), Tab DD, Tab QQ, Tab WW; Vol. VIII, Ex. 194 at 14-21, 23-24). He rejected as not credible the testimony of

Reposa and Chappell concerning a cash payment which Reposa had allegedly made to Chappell on July 14, 1999. See id. As support for this rejection, the ALJ observed that "[t]he record shows that ... Chappell initially denied ever being paid cash for his catch of fish and later through further prompting ... Chappell altered his testimony."[13] Initial Decision at 21 (citing Vol.

[13] Even on a cold record, the colloquy which preceded Chappell's statement that he paid his crew in cash gives cause for considerable doubt as to the truthfulness of that claim:

Q. Were you ever paid cash for your fish?

A. Was I ever paid cash for my fish?

Q. Were you ever paid cash for your fish?

A. Not to my knowledge. What fish are you speaking of?

Q. Fish that you would sell from the fishing vessel SISTER ALICE.

A. I was never paid cash for them, no.

Q. Were your crew members paid cash for any of that fish?

A. No.

Q. Did you ever pay them cash?

A. Did I ever pay them cash?

Q. Yes.

A. Did I ever pay them cash?

Q. For fish that -- for a fishing trip that they were on with you.

THE COURT: Pay the crew members cash?

THE WITNESS: On one occasion, yes.

THE COURT: When was that?

THE WITNESS: That was on this trip.

THE COURT: July 5 or 6?

THE WITNESS: Yes.

THE COURT: How much did you pay them?

THE WITNESS: I gave -- I think I gave them each $200.

THE COURT: Two deckhands?

VIII, Ex. 191 at 857-858).

The ALJ's disbelief of Reposa's and Chappell's testimony is fully understandable to this Court. It is apparent from the transcript that both men were hesitant and cautious in responding to key questions and that this detracted from their credibility. See e.g., Vol. VIII, Ex. 191 at 967-69; id. at 856-857. Reposa's explanation as to why he received half of the $2,117 which was paid to the F/V SISTER ALICE by Seair is particularly unpersuasive.[14] See id. at 967-69. His suggestion that Debra

---

THE WITNESS: Yes.

THE COURT: Each $200. Why?

THE WITNESS: Why? Because Mr. Reposa cashed the check and handed me cash.

Vol. VIII, Ex. 191 at 856-857.

[14] Reposa's explanation as to why he received half of the $2,117 which was paid to the F/V SISTER ALICE by Seair is excerpted below:

Q. And who does that settlement sheet indicate received an allocation?

A. Me.

Q. What did you receive that allocation for?

A. What did I receive it for?

Q. Right. What happened to the SeAir check when it came in?

MR. MacDONALD: Objection. Your Honor, can he answer the question?

MR. BERGERSEN: If it please the Court, I'm taking a step back in order to facilitate his answer.

THE COURT: So you're withdrawing the prior question?

MR. BERGERSEN: I withdraw the prior question.

THE COURT: What's your question now?

Q.. When the SeAir check for the SISTER ALICE came in, to the best of your knowledge, what was done with that check?

A. What was done with it? I walked into Markarian's one day, and Debbie [Siart] said to me, this is a

Siart was uncertain about what to do with the Seair check and sought his direction regarding it, see Vol. VIII, Ex. 191 at 968, is implausible. Siart had been working at the accountants for more than four years, see id., Ex. 193 (Deposition of Debra Siart) at 3-4, and M&M's standard procedure was to deposit such checks into the vessel's operating account while awaiting information about the crew and expenses so that a settlement statement could be prepared and checks written to pay these obligations, see id., Ex. 194 (Deposition of Cathy Clark) at 7-8, 41. Even more implausible is Reposa's implicit contention that Siart was oblivious to these obligations and that she would cavalierly suggest that he take the entire $2,117.00, see Vol. VIII, Ex. 191 at 968, even though the crew had not yet been paid. It is far more plausible and also consistent with Siart's deposition testimony that Reposa brought the Seair check to M&M, see id., Ex. 193 at 9, and that he directed Siart to write a check payable to himself for $1,058.00, see id. at 13; see also id., Ex. 194 (Deposition of Cathy Clark) at 26 (testifying that "[w]hen an owner wants a check, we give him a check"), 37-38 (stating that if Reposa asks for a check for $1,058.00 she gives it to him).

The ALJ also noted that there was no record in the financial statements provided by M&M which supported Reposa's and

---

> check from SeAir for $2,100 or whatever. And she said, what do you want me to do with it? I said, I don't know what to tell you to do with it. What do you want me to do with it? She said, you can do anything you want to with it. I said, I can do anything I want to with it? Well, just give me half, leave the other half with the boat, and I'll pay the crew cash. Because I was concerned about the other trips that I had confiscated or whatever, and I knew this one was under scrutiny.

Vol. VIII, Ex. 191 at 967-69; see also id. at 997.

Chappell's testimony that Chappell or his crew had received any cash payments. See Initial Decision at 21 (citing Vol. IX, Ex. 195, Tab DD, Tab QQ, Tab VV, Tab WW). The absence of such record is persuasive evidence that the payments did not occur, especially when considered with the deposition testimony of staff accountant Cathy Clark that "every crew member gets a check every time," Vol. VIII, Ex. 194 at 17, and that "the crew shares need to match for 1099 reasons. We have to make sure that everybody's been paid ...," id. at 28; see also id. at 8 ("Then we write the crew checks and pay all the expenses ....").

The ALJ also found that the Agency's case was further bolstered by the large discrepancy between the groundfish reported landed by the F/V SISTER ALICE on the FVTRs for July 5 and 6, 1999, and the corresponding Seair dealer report. See Initial Decision at 21. He noted that "[b]y far, this was the largest landing of ground fish reported by the F/V SISTER ALICE in a three year period (1997-1999) for the period July 6 through August 6 in each year." Id. (citing Vol. IX, Ex. 195, Tab C, Tab X (Offense Investigation Report by SA Louis J. Jachimczyk dated 4/17/00); Vol. VI, Ex. 188 at 160-63). The ALJ acknowledged that Chappell's estimates of the pounds and species of fish landed on the FVTRs completed by him have never been exact, but the ALJ concluded that "the large discrepancy between the FVTR and the Seair dealer report combined with the fact there is no record of ... Chappell ever being paid is suspect." Initial Decision at 21.

As shown in the table below, the ALJ's finding of a large discrepancy between the groundfish reported landed by the F/V SISTER ALICE and the groundfish purchased by Seair is supported by the evidence:

| **Species** | **Pounds landed by F/V SISTER ALICE** per the FVTRs | **Pounds purchased by Seair from F/V SISTER ALICE** on July 6, 1999 | **Discrepancy** (either overage or underage) |
|---|---|---|---|
| Blackback | 500 on July 5<br>200 on July 6<br>700 Total | 330 | +370 |
| Yellowtail Flounder | 500 on July 5<br>200 on July 6<br>700 Total | 755 | -55 |
| Cod | 50 on July 5<br>50 on July 6<br>100 Total | 190 | -90 |
| Pollock | | 40 | -40 |
| Monkfish | | 80 | -80 |
| | | | 635 Total |

Table based on information in Vol. IX, Ex. 195, Tab R, Tab S, Tab T (Seair Invoice dated 7/7/99).

With regard to other eyewitnesses, the ALJ took note of the testimony of Stanley K. Perry (a.k.a. "Bubba"), see Initial Decision at 8, the assistant dock foreman at Town Dock where the F/V DONA MARIA was unloaded, see Vol. VII, Ex. 190 at 700, and Bruce Hawkins, see Initial Decision at 8, a dealer for Breachway Seafood, Inc. ("Breachway"),[15] see Vol. VI, Ex. 188 at 216, 234-35, both of whom were present during the offload of fish from the F/V DONA MARIA, see Initial Decision at 8, and that of John Fallon, see id., who served as first mate on the F/V DONA MARIA, see id. The ALJ described the testimony of Perry and Hawkins by stating that "they did not recall observing any ground fish being

[15] Breachway Seafood, Inc. ("Breachway") was jointly owned by Reposa, Bruce Hawkins, and Peter Reposa. See Initial Decision at 6 (citing Vol. IX, Ex. 195, Tab F (Supplement to Offense Report prepared by SA McCarron dated 2/7/02), Tab L (Federal Fisheries Dealer Permit issued to Breachway and Reposa dated 12/19/98)).

offloaded from the F/V DONA MARIA on July 6, 1999." Id. (citing Vol. IX, Ex. 195, Tab F (Supplement to Offense Report prepared by SA McCarron dated 2/7/02); Vol. VI, Ex. 188 at 234; Vol. VII, Ex. 189 at 706-09, 721-22, 730-31). While in the case of Perry this perhaps understates his testimony somewhat, since he ultimately declared (after repeatedly stating that he did not see any groundfish, see Vol. VII, Ex. 190 at 706-09, 721-22) that "[i]t didn't come off that boat," id. at 722, and that he was in a position to observe all fish coming off the F/V DONA MARIA, see id. at 724, 726, 730-31, the record discloses ample grounds for discounting Perry's testimony.

First, Perry's explanation for being able to remember what had happened three years earlier on July 6 and 7, 1999, seems dubious. See id. at 723-24. He attributed his ability to remember this particular offload because the F/V DONA MARIA "didn't do many Frometta trips ...," id. at 723, and that the vessel "only did like three," id. This explanation appears even more doubtful in light of his testimony: 1) that no one had talked to him about the case prior to meeting with the Plaintiffs' attorneys the night before he testified, see id.; 2) that he had no memory of Reposa coming into Town Dock and yelling about someone reporting him to the DEM or of the DEM police coming into the facility (events which plausibly might have given him reason to remember the offload in question), see id. at 727-728; and 3) that he (Perry) was offloading thirty boats a week at that time (in the summer of 1999), see id. at 721. Second, Perry's insistence that he never leaves the dock to take a break, go to the bathroom, go to lunch, go to his office, or go anywhere else strains credulity. See id. at 722, 724.[16] Third, Perry is

[16] Although at one point Perry seems to allow that if he had to go to the bathroom, he would stop, see Vol. VIII, Ex. 190 at 724, he then proceeded to reaffirm that: "I didn't leave. I never leave," id.

a convicted felon, having received an eight year suspended sentence with eight years probation for "a drug charge and receiving stolen goods." Id. at 710. Fourth, on cross-examination Perry repeatedly refused to acknowledge the possibility that groundfish could have been offloaded from the vessel, see id. at 721-722, but when questioned by the ALJ about this same point he allowed that "[a]nything is possible," id. at 731, a change which suggests a bias against the Agency. Fifth, although Plaintiffs describe Perry as a "disinterested person," Plaintiffs' Mem. at 5, he met with Reposa's counsel the night before the hearing at the attorney's office, see Vol. VII, Ex. 190 at 704, was driven to the hearing by Reposa's attorney, see id. at 719, and had lunch with Reposa the day of his (Perry's) testimony, see id.

As for Hawkins, while he testified that he did not see any groundfish taken off the F/V DONA MARIA, see Vol. VI, Ex. 188 at 234, his job was inside the building, id. at 240, and he did not recall if he went out to the boat or not, see id. He also stated that he was "completely busy doing my job," Vol. VII, Ex. 189 at 474, and readily acknowledged that it was possible that groundfish were offloaded when he was not present, see id. at 473-74; Vol. VI, Ex. 188 at 265-66. The ALJ's statement that Hawkins did not recall observing any groundfish being offloaded from F/V DONA MARIA is a fair characterization of his testimony.

Fallon, a crew member on the F/V DONA MARIA for the trip that started on July 3, 2006, see Vol. VII, Ex. 190 at 733, 739, testified that the vessel did not offload any groundfish, id. at 734. However, despite Plaintiffs' assertion to the contrary, see Plaintiffs' Mem. at 5, Fallon was not a disinterested person. He is Reposa's nephew, see Vol. VIII, Ex. 191 at 973, and he had worked on the F/V DONA MARIA (and thus for Reposa) for seven and a half years, see Vol. VII, Ex. 190 at 732; see also United

States v. Canales, 744 F.2d 413, 425 (5th Cir. 1984)(stating that intimate family relationship with a party or employment by a party are among the common circumstances which are admissible to show a witness's bias). Although Fallon had sought other employment three weeks prior to the hearing because the F/V DONA MARIA had broken down, see Vol. VII, Ex. 190 at 733, he acknowledged that he would like to work for Reposa again at some point, see id. at 737, and agreed that employment on the F/V DONA MARIA was "a good job," id. In addition, Fallon's explanation for remembering this particular trip appeared to be inconsistent. While he testified that the trip stood out "[b]ecause it came back that we offloaded the ground fish," id. at 736-37, and that Reposa had "mentioned it to me," id. at 737, Fallon was unable to recall if he had talked with Reposa about DEM investigating the offload shortly after the trip, id. at 738. In fact, Fallon was unable to recall the first time he heard about the case being investigated, see id., a circumstance which seemingly he should have recalled since he claimed it was the allegation of the illegal offload which caused him to remember the trip, see id. at 736-37. Moreover, like Perry, Fallon had a criminal record, having received two years probation for being "drunk and disorderly and tampering with a motor vehicle." Id. at 735.

Although David Barbera, who owned Seair at the time,[17] see

---

[17] David Barbera and Seair were charged in a related NOVA and NOPS with making false statements to an authorized officer in violation of 50 C.F.R. § 600.725(i) and unlawfully interfering with an investigation in violation of 50 C.F.R. § 648.14(a)(8). See Initial Decision at 3. These violations were consolidated for hearing with those against Reposa, Chappell, and Reposa Fisheries. See id. at 4. At the hearing, the charge against Barbera and Seair of violating 50 C.F.R. § 648.14(a)(8) was withdrawn and substituted with a violation of 50 C.F.R. § 600.725(j). See id. at 3. The latter provision prohibits, inter alia, interference with an investigation of seized property in connection with enforcement of the Magnuson-Stevens Act. See id. The ALJ found that the substituted charge was proved based on Barbera's action in discarding a 3x5 index card that Barbera relied

Vol. VII, Ex. 190 at 611, testified that the groundfish came from the F/V SISTER ALICE, see id. at 629, the exceedingly thin basis for this belief was succinctly established by the ALJ during the hearing.[18] Indeed, Barbera's opinion as to the source of the groundfish was based solely on what unknown persons said to him.

---

upon to create the Seair dealer report concerning the purchase of fish from the F/V SISTER ALICE. See id. at 13-14, 20. The ALJ also found that Seair was vicariously liable for Barbera's action. See id. at 14, 20. The ALJ imposed a $15,000.00 civil penalty jointly and severally against Barbera and Seair for this violation. See id. at 25. The charge of making false statements to an authorized officer was found not to be proved. See id. at 16. Barbera and Seair did not appeal the adverse finding and penalty.

[18] The ALJ's examination of Barbera on this point appears below:

THE COURT: You mean you believe it came from the SISTER ALICE because somebody called you on the phone and said, hey, we have a load from the SISTER ALICE, can you take it?

THE WITNESS: Yes.

THE COURT: And then this truck arrived and gave you the totes?

THE WITNESS: Yes, and said something about dropping off the fish.

THE COURT: And said something about the SISTER ALICE, so you assumed it was the SISTER ALICE. But that's the only evidence you have that it came from the SISTER ALICE?

THE WITNESS: Yes, Your Honor.

THE COURT: The call and someone from the truck saying something about the SISTER ALICE?

THE WITNESS: Yes.

THE COURT: That's what you're basing your opinions on?

THE WITNESS: I have no facts to base it on.

THE COURT: There are no other facts; correct?

THE WITNESS: There are no other facts.

Vol. VII, Ex. 190 at 630-31; see also id. at 697.

See Vol. VII, Ex. 189 at 489-90, 496, 564; id., Ex. 190 at 692-93, 697.

Thus, to the extent Plaintiffs contend that the ALJ's findings are not supported by substantial evidence because he declined to credit the testimony of Reposa and Chappell and was apparently unpersuaded by the testimony of Barbera, Hawkins, Perry, and Fallon, such contention is rejected. "The determination of the credibility of the witnesses is within the discretion of the presiding official who heard their testimony and saw their demeanor." Griessenauer v. Dep't of Energy, 754 F.2d 361, 364 (Fed. Cir. 1985); see also Roque v. Evans, No. Civ.A 01-CV-10709-R, 2003 WL 131725, at *1 n.4 (D. Mass. Jan. 16, 2003)(noting that district court "is not free to substitute its judgment on this issue [of credibility] for that of the ALJ"); McFadden v. Barnhart, No. 02-1449 SC, 2002 WL 31031305, at *4 (N.D. Cal. Sept. 9, 2002)("[D]etermining credibility is properly the province of the ALJ, who has the opportunity to listen to and observe the [witness's] testimony.").[19] Although Plaintiffs

---

[19] The rationale for this deference to the hearing officer has been well explained by the Second Circuit:

> A fact-finder who assesses testimony together with witness demeanor is in the best position to discern, often at a glance, whether a question that may appear poorly worded on a printed page was, in fact, confusing or well understood by those who heard it; whether a witness who hesitated in a response was nevertheless attempting truthfully to recount what he recalled of key events or struggling to remember the lines of a carefully crafted "script;" and whether inconsistent responses are the product of innocent error or intentional falsehood. Reviewing courts have long recognized ... that a witness may convince all who hear him testify that he is disingenuous and untruthful, and yet his testimony, when read, may convey a most favorable impression. This is because a cold transcript contains only the dead body of the evidence, without its spirit. It cannot reveal the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration.

complain about "rank hearsay," Plaintiffs' Mem. at 4, 8, there "[is] no administrative rule of automatic exclusion for hearsay evidence, ... the only limit to the admissibility of hearsay evidence is that it bear [a] satisfactorily [sic] indicia of reliability," Roque v. Evans, 2003 WL 131725, at *2 (alterations in original). More importantly, here the ALJ relied primarily upon "the contemporaneous financial records and testimony of the staff accountants at Markarian and Meehan," Initial Decision at 21, for his findings, neither of which can fairly be described as "rank hearsay." In sum, the Court finds that the ALJ's findings are supported by substantial evidence.

**2. Testimony of Expert Witness**

Plaintiffs contend that the testimony of their expert, Dr. Joseph DeAlteris, was unimpeached and unrebutted, Plaintiffs' Mem. at 6-7, and that it was error for the ALJ to disregard or reject this testimony, id. at 8. The specific testimony which Plaintiffs describe as unimpeached and unrebutted was Dr. DeAlteris's "opinion that the groundfish catch at ultimate issue in these cases, as reported being landed by the F/V Sister Alice, was 'consistent with everything that she had done through the 1999 period.'" Id. at 6 (quoting Vol. VII, Ex. 190 at 598[20]). Plaintiffs also complain that "the 'absolute values' formulation apparently relied upon by the Administrative Law Judge (Initial [D]ecision Page 18), was a specious orange adduced by Agency Counsel during cross-examination ... and absent independent

---

Zhang v. United States Immigration & Naturalization Serv., 386 F.3d 66, 73 (2nd Cir. 2004)(internal quotation marks and citations omitted).

[20] Plaintiffs in citing to the transcript and exhibits do not identify in which volume of the record the cited material may be found. Because the record comprises eleven volumes, this omission makes locating the cited references difficult. The Court in citing to Plaintiffs' Mem. supplies the omitted information.

expert statistical validation ... does not support the proposition for which [the ALJ] cited [it]." Id. at 7-8 (quoting Vol. VII, Ex. 190 at 609).

The Court cannot agree with Plaintiffs' claim that Dr. DeAlteris's testimony was unimpeached and unrebutted. Indeed, the Court is unable to reconcile his testimony with the exhibits upon which it was presumably based. Dr. DeAlteris testified that the discrepancy between what the F/V SISTER ALICE reported as its catch for the two trips on July 5 and 6, 1999, and what Seair reported as being purchased from the vessel for those two trips was 255 pounds. See Vol. VII, Ex. 190 at 595-596, 607, 609; see also Vol. X, Ex. 196 (Reposa's Exhibits) at Tab 1 (Report of Dr. DeAlteris dated 4/30/02 ("Dr. DeAlteris's Report")) at 3. It appears that he based this statement on a belief that the F/V SISTER ALICE reported landing 1050 pounds of mixed finfish on July 5, 1999, and 600 pounds of mixed finfish on July 6, 1999, or a total of 1650 pounds. See Dr. DeAlteris's Report at 2. However, Dr. DeAlteris was mistaken in this belief. The FVTR which the F/V SISTER ALICE filed for the July 6th trip reflects that the vessel landed 450 pounds of mixed finfish, not 600 pounds. See Vol. IX, Ex. 195, Tab S.[21]

---

[21] On November 30, 2005, the Court sent Plaintiffs' counsel a letter, advising that it was unable to reconcile Dr. DeAlteris's poundage figures with the exhibits on which they were presumably based. See Letter from Martin, M.J., to Bergersen of 11/30/05 (citing DeAlteris's Report at 2; Vol. IX, Ex. 195, Tab R, Tab S, Tab U). The Court asked whether Plaintiffs agreed that Dr. DeAlteris had made an error as to these figures. See id. If Plaintiffs did not so agree, the Court requested that they explain their theory as to how the figures were obtained and how they could be reconciled with the exhibits. See id.

In response, the Court received two letters from Plaintiffs' counsel, both indicating that answers would be forthcoming. See Letters from Bergersen to Martin, M.J., of 12/8/05 and 1/3/06. When no answers were received by March 30, 2006, the Court again wrote to Plaintiffs' counsel and directed that the answers be provided "at this time." Letter from Martin, M.J., to Bergersen of 3/30/06. The Court

Correctly calculated, the discrepancy (as to groundfish) between what the F/V SISTER ALICE reported landing and what Seair reported purchasing from the vessel is 105 pounds.[22] This discrepancy is substantially less than the 255 pounds which Dr. DeAlteris determined. Considered in isolation, the smaller discrepancy actually bolsters Dr. DeAlteris's opinion that the F/V SISTER ALICE's FVTRs for the two trips at issue were "within ... the levels of discrepancies that were going on all year long." Vol. VII, Ex. 190 at 596. However, when Dr. DeAlteris's testimony is considered as a whole, there is substantial reason to doubt the overall reliability of his calculations and, thus, his opinion.

Dr. DeAlteris testified that the average discrepancy between what was reported landed and what was reported purchased was 119 pounds in usually three to five species per trip. See id. at 594-95. On direct examination, he stated that he used "absolute value[s]," id. at 595, in determining the size of the discrepancy for a given trip, see id.:

> So if that was 119 pounds on a given day or trip, there might be a 20-pound error in one species with a positive or negative, a 50-pound error with another species, and then another 50-pound error. The sum of those three would give you the 119-pound error. I considered both positive errors and negative errors, so underreporting and overreporting, as an error, the absolute value of that. Because either way, an underreport or an overreport represents a discrepancy.

Vol. VII, Ex. 190 at 595; see also id. at 599 ("I looked at discrepancies in terms of neither whether they were over or

---

has yet to receive an answer to its questions.

[22] The calculations which result in the figure of 105 pounds of groundfish are: 1050 lbs. reported landed on 7/5/99 FVTR (Vol. IX, Ex. 195, Tab R) + 450 lbs. reported landed on 7/6/99 FVTR (id., Tab S) = 1500 total lbs. reported landed by F/V SISTER ALICE - 1395 total lbs. reported purchased by Seair (id., Tab U) = 105 lbs.

under, because I took the absolute value of that discrepancy.").

On cross-examination, Dr. DeAlteris initially continued to maintain that in his calculations he had used absolute values:

> Q. And the discrepancies are concerning absolute values. For example, if there is a discrepancy of minus 5 pounds of one species -- I'm talking about one trip now. If you had minus 5 of one species and plus 20 of another species and then plus 300 of another species, you would say that that was a 325-pound discrepancy?
>
> A. Yes. I would take the absolute value of all of them. So if there was a negative and a positive, I wouldn't sit there and algebraically add them. I would say there was a total of each of them individually. So that's actually showing -- in my mind, that's the fairest way of looking at a discrepancy, because we don't know who's right or who's wrong, we just know there's a discrepancy between the two. So I took the absolute value of them.
>
> ....
>
> Q. So if somebody had reported on a particular trip that they landed 300 pounds of blackback flounder and the dealer purchased 300 pounds of yellowtail flounder, that would be a 600-pound discrepancy?
>
> A. That's true.

Vol. VII, Ex. 190 at 601-02; see also id. at 606 ("Then we turn around and take the absolute value of that, and we summed them all up."). However, later in his cross-examination, when questioned about his finding of a 255 pound discrepancy for the trips which ended on July 5 and 6, 1999, Dr. DeAlteris contradicted his earlier testimony and indicated that the figure of 255 pounds had been arrived at by adding the positives and negatives algebraically. See id. at 609.

> Q. So we have a 370-pound discrepancy on blackback, a 55-pound discrepancy on yellowtail, a 90-pound discrepancy on codfish, 40 pounds of pollock, and 80 pounds of monkfish, is that correct, from what you were

just reporting?

A. Yes. So the total discrepancy for that day, if you take the positive and the negative, turns out to be about 255 pounds.

Q. I thought that you added up all the discrepancies, so it would be a cumulative discrepancy of 600 and some odd pounds?

A. Well, I see what you're saying. What's the algebraic sum of that, if you take the positives and the negatives? **Apparently we took the positives and negatives for a given day and then took the absolute values of the total for the daily sum.**

Q. Yes. That's what I thought you did. So the discrepancy on this day would have been 635; right?

A. Yes.

Vol. VII, Ex. 190 at 609-610 (bold added). Even more disturbing, Dr. DeAlteris's response suggests that he did not personally perform the calculations and that he was unsure of the methodology which had been utilized by the person or persons who did. Evidence that this was in fact the case can be found in the tables upon which Dr. DeAlteris relied upon for his opinion. Although he testified that he "wouldn't sit there and algebraically add [the negative and positive numbers]," id. at 601, it is clear that this is exactly what someone did. In Table IV of his report, see Vol. X, Ex. 196, Tab 1 (Dr. DeAlteris's Report) at 11-12 (Table 4), there are numerous entries where the positive and negatives numbers were added algebraically, resulting in smaller discrepancies between what the F/V SISTER ALICE reported landing and what the dealer reported purchasing from the vessel. See, e.g., id. (entries for 1/18/99, 1/28/99, 2/2/99, 2/8/99, 2/10/99, 2/22/99, 3/24/99, 4/8/99, 4/19/99, 4/21/99, 4/28/99, 4/29/99, 5/6/99, 5/19/99, 5/21/99, 6/1/99, 6/11/99, 6/12/99, 6/14/99, 6/15/99, 6/16/99, 6/17/99, 7/14/99,

7/15/99, 7/21/99, 7/22/99).

The ALJ found Dr. DeAlteris's opinion not to be credible because he concluded that Dr. DeAlteris had employed a different methodology in comparing the reports of the July 5th and 6th trips to the other trips made during the period January 5, 1999, through December 31, 1999. See Initial Decision at 18 n.14. Given Dr. DeAlteris's basic error regarding what was reported on the July 6, 1999, FVTR (Vol. IX, Ex. 195, Tab S), his contradictory testimony regarding the methodology which was used for determining the amount of the discrepancy, and his seeming unfamiliarity with the actual methodology employed, the ALJ had ample reason to reject the opinion of Plaintiffs' expert. Plaintiffs' claim of error in this regard is, therefore, rejected.

**3. Use of Financial Information**

Plaintiffs argue that the admission and use of financial information, which they provided only incident to ability to pay verification requests of the Agency's expert, was improper, both as proof of the case in chief and as rebuttal evidence. See Plaintiffs' Mem. at 9. Without citing any authority, Plaintiffs assert that if they had not chosen to raise the ability to pay issue, the "Agency would have had no right whatsoever to any financial information of these parties." Id. at 15. To the extent that Plaintiffs contend that the Agency had no right to obtain financial records relating to the two trips in question or to the period immediately preceding and following those trips, the Court disagrees as such evidence is relevant and probative.

The specific exhibits about which Plaintiffs complain are Agency Exhibits ("Ag. Exs.") QQ-WW. See Plaintiffs' Mem. at 15. These exhibits are located in Vol. IX, Ex. 195, Tabs QQ-WW and are listed below:

QQ M&M Settlement Sheets # 38-59 for the F/V

SISTER ALICE Trips Sold from June 6,[23] 1999 - August 19, 1999

RR M&M Settlement Sheets # 19-23 for the F/V DONA MARIA Trips Sold from June 15, 1999 - August 5, 1999

SS Canceled checks from Clarke A. Reposa, Sr., d/b/a F/V DONA MARIA

TT M&M Disbursements Journal for the F/V DONA MARIA from July 1, 1999 - August 20, 1999

UU M&M Receipts Journal for the F/V SISTER ALICE from June 1, 1999 - August 27, 1999

VV Reposa Fisheries, Inc., Check No. 1028 dated July 14, 1999 issued to Clarke A. Reposa, Sr.

WW M&M Disbursements Journal for F/V SISTER ALICE from July 6, 1999 - August 13, 1999

As is apparent from the above list, Ag. Exs. QQ-WW pertained to a relatively brief two month period of time which encompasses the trips in question.

The ALJ found Plaintiffs' argument that Ag. Exs. TT, UU, and WW were confidential and provided under seal pursuant to 15 C.F.R. § 904.204(c),[24] and not otherwise discoverable to be

---

[23] Although the cover sheet for Ag. Ex. QQ indicates that the documents contained therein are for the period "from 6/6/99 - 8/19/99," Vol. IX, Ex. 195, Tab QQ, the "6/6/99" date appears to have been an error. The earliest date reflected in the documents marked as Ag. Ex. QQ is "6/16/99," <u>id.</u> at 1.

[24] At the time of the hearing in 2002, 15 C.F.R. § 904.204(c) provided that ALJ had the authority and duty to:

> Schedule and regulate the course of the hearing and the conduct of the participants and the media, including the power to close the hearings in the interests of justice; **seal the record from public scrutiny to protect privileged information**, trade secrets, and confidential commercial or **financial information**; and strike testimony of a witness who refuses to answer a question ruled to be proper[.]

without merit. See Initial Decision at 21; see also Vol. VIII, Ex. 192 at 1076-77 (overruling Plaintiffs' objection to Ag. Exs. QQ-WW). In making this finding, the ALJ noted that Respondents' Opening Statement and List of Exhibits "show that [Plaintiffs] specifically limited the application of 15 C.F.R. § 904.204(c) to the [Plaintiffs'] NOAA financial statements and income tax returns." Initial Decision at 21; see also Vol. IV, Ex. 131 (Respondents' Opening Statement and Exhibits); id., Ex. 132 (Respondents Todd Chappell and Reposa Fisheries, Inc. Opening Statement and Exhibits). Based on this fact, the ALJ found that no limitations had been placed upon consideration of the other financial records. See Initial Decision at 21. This Court finds that the record supports the ALJ's determination that Plaintiffs' opening statement and list of exhibits only designated Reposa's, Chappell's, and Reposa Fisheries' NOAA Financial Statements and 2001 federal income returns as confidential financial information provided under record seal pursuant to 15 C.F.R. § 904.204(c). See Vol. IV, Ex. 131 at 3; id., Ex. 132 at 3.

Of even greater significance, however, is the fact that the Government issued a subpoena to M&M for these records early in the case. See Vol. I, Ex. 14 (Subpoena). The subpoena required M&M to bring the following described records to a records deposition:

> Any and all original business records for F/V Dona Maria and F/V Sister Alice (and any and all parent corporations or entities and/or wholly-owned or controlled subsidiary corporations, including but not limited to []Clarke Reposa and Todd Chappell) pertaining to the purchase, sale, trade, transfer, settlement and acquisition of any fish or fish products for the period from June 15, 1999[,] to August 16, 1999, and all related

---

15 C.F.R. § 904.204(c) (2002)(bold added). In the current C.F.R., this provision is found at 15 C.F.R. § 904.204(d) (2006).

accounting and financial records ....

Vol. I, Ex. 14 at 1. The subpoena specifically demanded "payroll records, financial records ... and other documents reflecting payments to or from ... said vessels and/or corporations," id., during this two month period, see id. While three of the challenged exhibits, Ag. Exs. QQ, TT, and UU, contain one or more documents which are outside the temporal scope of the subpoena (6/15/99 to 8/16/99) by a matter of days,[25] the ALJ did not rely upon any of these documents for his findings. See Initial Decision at 21. Moreover, even though the ALJ included Ag. Exs. QQ and WW as among the exhibits supporting his finding that "[t]he payment of Clarke Reposa, instead of Todd Chappell and his crew ... was unusual and inconsistent with the accounting practices at Markarian and Meehan," Initial Decision at 21, the strongest evidence of this inconsistency came from the Clark Dep. which the ALJ also cited.[26]

While the ALJ cited Ag. Exs. QQ and WW as among the exhibits supporting his finding that "there is no record in the financial statements provided by Markarian & Meehan that ... Chappell or his crew received any cash payments," Initial Decision at 21 (citing Vol. IX, Ex. 195, Tab DD, Tab QQ, Tab VV, Tab WW), and Ag. Ex. WW as supporting his ultimate finding "that it is more probable that Clarke Reposa did in fact land the ground fish but he did so on board the F/V DONA MARIA," id. (citing Tab WW), the Court sees nothing improper in the ALJ's consideration of these

---

[25] The following documents are outside the temporal scope of the subpoena: Ag. Ex. QQ at 67, 68 (Settlement Sheets for F/V SISTER ALICE reflecting payment dates of 8/19/99); Ag. Ex. TT at 5 (F/V DONA MARIA Disbursement Journal #1 reflecting payments made on 8/17/99 and 8/20/99); Ag. Ex. UU at 1, 3 (Reposa Fisheries, Inc. d/b/a F/V SISTER ALICE RECEIPTS JOURNAL #1 reflecting payments beginning 6/1/99 and continuing through 8/27/99).

[26] See discussion of Clark deposition at 14-15.

exhibits. The Court agrees with the Government that the documents (Ag. Exs. QQ-WW) should have been provided in response to the earlier subpoena, see Vol. I, Ex. 14 (Subpoena), and that they would not have been subject to any seal or privilege, see Memorandum in Support of Government's Motion for Summary Judgment ("Government's Mem.") at 20. The fact that the documents were apparently belatedly provided by Plaintiffs, see Vol. VIII, Ex. 192 at 1073-74, as part of Plaintiffs' submission regarding ability to pay, id. at 1073, does not make the Government's use of the records improper.[27]

In sum, to the extent Plaintiffs contend that the Government had no right to obtain these records (Ag. Exs. QQ-WW), see Plaintiffs' Mem. at 14-15 (appearing to so argue), such argument is rejected. The records at issue were for a relatively brief two month period of time which was directly relevant to and probative of the violations charged.

**4. Allowance of Post-hearing Analysis and Attachments**

Plaintiffs charge that "[t]he allowance of post-hearing analysis and Agency attachments to post-hearing filings was manifestly improper and grossly prejudicial given the closed state of the hearing record." Plaintiffs' Mem. at 13. Plaintiffs complain that "the [A]gency attachments sought to impeach unrebutted expert testimony at [the] hearing ...," id.,

---

[27] At the November 28, 2005, hearing Plaintiffs' counsel argued that the earlier subpoena had been "complied with," see Tape of 11/28/05 Hearing, and that any information received by the Agency after May 18, 2001, could only be used for purposes of determining Plaintiffs' ability to pay, see id. As almost all of the documents about which Plaintiffs complain were within the scope of the original subpoena, see above discussion at 29-31, the Court can only conclude that the compliance to which Plaintiffs' counsel referred was incomplete. The Court rejects Plaintiffs' implicit argument that documents responsive to the subpoena which were provided to the Agency after May 18, 2001, could not be used in the Agency's case in chief or for rebuttal.

and that they "were submitted as multi-function post-hearing analysis, self-authenticating contrary to basic principles of admissible evidence ...," id. at 14.

The Court's consideration of this claim of error is hampered by Plaintiffs' failure to cite to the record regarding the "analysis" and "attachments" about which they complain. See id. at 13-14. Plaintiffs do not identify the allegedly offending material by exhibit letter or number.[28] See id. In a case where the record comprises eleven volumes and contains more than 200 exhibits, this omission is more than a minor inconvenience. Cf. Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1168 n.6 (10th Cir. 2000)(declining to search record for support for argument where plaintiff in his brief cited to depositions and exhibits without providing any indication of where in voluminous record these documents could be found).

As best the Court can determine, Plaintiffs' ire is directed at the Agency's Initial Brief, see Vol. IV, Ex. 154 (Agency's Initial Brief), and the attachments thereto,[29] see id., Attachments A-I.[30] While the attachments are easily identified

---

[28] At one point Plaintiffs refer to "Agency Rebuttal Brief," Plaintiffs' Mem. at 14, but they similarly fail to identify this document by exhibit number. Thus, the Court was forced to comb through the record to locate it.

[29] Despite its name, the Agency's Initial Brief was submitted after the hearing.

[30] The Attachments to the Agency's Initial Brief are listed below:

A F/V SISTER ALICE Settlement Sheets
Comparison of Captain's Pay and Crew Pay to Net Crew Share

B Chappell's Personal Logbook Entries for Groundfish compared with his FVTR Reporting

C Chappell's Answers to Agency's Second Set of Interrogatories

D Spreadsheet comparing F/V SISTER ALICE logbook entries

as they are labeled Attachments A through I, the allegedly objectionable "analysis" about which Plaintiffs complain is presumably contained somewhere within the twenty-three pages of the Agency's Initial Brief. This Court declines to search through that document and guess what parts constitute the "analysis" which Plaintiffs challenge.[31] See United States v. Rodriguez-Aguirre, 108 F.3d 1228, 1238 n.8 (10th Cir. 1997)("In the absence of essential references to the record in a party's brief, the court will not 'sift through' the record to find support for the claimant's arguments."); United States v. Upton, 91 F.3d 677, 684 n.10 (5th Cir. 1996)(declining to reach merits of argument because claims made without citation to authority or references to the record are considered abandoned on appeal); United States v. Acosta, 763 F.2d 671, 680 (5th Cir. 1985) (holding that by failing to make their arguments with specificity, appellants in essence waived further consideration

---

with the FVTR

| | |
|---|---|
| E | Chappell's FVTR Reporting Compared with Sales of Groundfish |
| F | Summary excerpt from Bruce Hawkins Cell Phone Records |
| G | Summary excerpt from F/V SISTER ALICE Cell Phone Records |
| H | Barbera and Seair's Answers to Agency's Interrogatories |
| I | Subpoena Duces Tecum for Barbera's telephone records with attached note |

Vol. IV, Ex. 154 (Agency's Initial Brief), Attachments A-I.

[31] To the extent Plaintiffs contend that any mention of the Attachments in the Agency's Initial Brief constitutes objectionable "analysis," such contention is rejected. Three of the attachments, C, H, and I, are pleadings, a point which the ALJ made in denying Plaintiffs' motion to strike the attachments, see Vol. V, Ex. 169 (Order Denying Respondents' Motion to Strike) at 3, and again in rejecting Plaintiffs' Counter Arguments to the Order Denying Respondents' Motion to Strike, see Vol. V, Ex. 171 (Order) at 3. The proposition that it was improper for the Agency to mention or discuss these pleadings in its Initial Brief is patently without merit.

of them on appeal); see also Luddington v. Indiana Bell Tel. Co., 966 F.2d 225, 230 (7th Cir. 1992)(stating that the "court is not equipped to act as auxiliary lawyer for a party to an appeal" and that "[t]he responsibility for the identification, framing, and argument of the issues on appeal is that of the lawyers, not that of the judges"). Accordingly, Plaintiffs' claim of error based on allegedly improper post-hearing analysis will not be considered because of their failure to identify the challenged analysis with reasonable specificity.

Turning to the Attachments themselves, Plaintiffs do not point to any part of the ALJ's Initial Decision where he relied upon or utilized the allegedly offending Attachments or their subject matter. This Court's own review of that document finds no such reliance. Attachments B, D, and E compare Chappell's personal logbook with other documents,[32] but there is no mention of Chappell's personal logbook in the Initial Decision. The same is true for Attachments F and G, which involve cellphone records and analysis, and also for Attachment I, which is a subpoena for David Barbera's telephone records. The Initial Decision contains no reference to any cellphone or telephone communications. Attachments C and H are answers to interrogatories from, respectively, Chappell and Barbera/Seair; neither document is cited in the Initial Decision.

The only attachment which contains any information which arguably could have been used by the ALJ in reaching one of his findings is Attachment A. Attachment A is a spreadsheet analysis showing that the alleged $200.00 crew payments are inconsistent with wages paid on twenty-two other settlement sheets. See Vol. IV, Ex. 154 (Agency's Initial Brief) at 10 n.9. In the Initial

---

[32] As Plaintiffs have provided no description of the Attachments, the Court relies upon the Agency's Initial Brief for that information. See Vol. IV, Ex. 154 (Agency's Initial Brief) at 10-16, 19.

Decision, the ALJ found that payment of Reposa, instead of Chappell and his crew, for the groundfish was unusual and inconsistent with the usual accounting practices at M&M, see Initial Decision at 21 (citing Vol. IX, Ex. 195, Tab E, Tab DD, Tab QQ, Tab WW; Vol. VIII, Ex. 194 at 14-21, 23-24), and that the testimony of Reposa and Chappell concerning a cash payment on July 14, 1999, was not credible, see id. While Attachment A would tend to support both findings, there is sufficient evidence in the record to support each of these findings independent of the information contained in Attachment A. The Court has already cited the deposition testimony of staff accountant Cathy Clark, see Discussion Section VI. A. 1. supra at 14, and the implausibility of Reposa's and Chappell's testimony concerning the cash payments, see Discussion Section VI. A. 1. supra at 11-13; see also id. at 12 n.13; id. at 13-14 n.14. Thus, there is no basis to overturn these two findings as there is substantial evidence in the record supporting them independent of Attachment A.

Moreover, even if the ALJ relied in part on information contained in the Attachments for his findings, this Court sees no error in such reliance or in the ALJ's denial of Plaintiffs' motions to strike those Attachments. See Vol. V, Ex. 169 (Order Denying Respondents' Motion to Strike); id. Ex. 171 (Order); see also id., Ex. 156 (Respondents Clarke A. Reposa, Sr., Todd Chappell and Reposa Fisheries, Inc.'s Motion to Strike the Attachments to Agency's Initial Brief). In explaining his denial of the motion to strike, the ALJ wrote:

> The attachments are merely duplicative and provided for convenience or otherwise to aid the Court's examination of documents that are already part of the administrative record. Therefore, they will be considered as part of the Agency's argument rather than evidence.
>
> I also find that Attachments A, B, and D through G

> appended to the Agency's initial brief and Attachment A appended to the Agency's reply brief are not "exhibits" as the term is defined in Black's Law Dictionary. The Agency's argument that **they are merely summaries used as pedagogical devices to organize or aid the judge's examination of documents that are already admitted into evidence** is well taken. No new information is provided in the summaries. Therefore, they will also be considered as argument.[33]

Vol. V, Ex. 169 at 3 (bold added).

Having reviewed the Attachments, this Court agrees with the ALJ's characterization and description of them and of their intended purpose. Accordingly, Plaintiffs' claims of procedural error based on the ALJ's allowance of post-hearing attachments is rejected.

**5. Conclusion Regarding 3x5 Card**

Plaintiffs next contend that the ALJ's conclusion that Barbera impeded the investigation by discarding the 3x5 card which he used to create the Seair dealer report, thereby violating 50 C.F.R. § 600.725(j), demonstrates "the flawed logic permeating this Initial Decision ...." Plaintiffs' Mem. at 9 (citing Initial Decision at 20). As to this point, even if the Court shared Plaintiffs' view that the ALJ's finding regarding Barbera was erroneous (and it does not), Plaintiffs cite no authority for the novel proposition that an erroneous finding as to one respondent's violation provides a basis for overturning findings regarding other distinct violations by different respondents. Furthermore, the Court agrees with the Government that "[t]here is no evidence that the ALJ considered Barbera's destruction of the 3x5 card as evidence against the plaintiffs."

---

[33] In a footnote which appears at this point in the ALJ's order, he discusses Attachments A, B, and D through G and identifies the evidence in the record from which each is derived. See Vol. V, Ex. 169 at 3 n.2.

Government's Mem. at 17 n.14. Plaintiffs' claim of error based on the ALJ's finding that Barbera violated 50 C.F.R. § 600.725(j), see Initial Decision at 20, is, therefore, rejected.

### 6. Other Alleged Procedural Errors

#### a. Impeachment of Reposa, Ag. Ex. KK, and Scope of Cross-Examination

Plaintiffs allege that the "impeachment," Plaintiffs' Mem. at 10, or "attempted impeachment," id. at 12, of Reposa was improper, see id., that Agency Ex. KK was wrongfully admitted, id., and that on multiple occasions the ALJ allowed questioning by Agency Counsel which was far beyond the scope of direct examination, see id. at 13. The basis for these complaints appears to be the following. On cross-examination, Reposa testified that his catch had been seized on three prior occasions and that he had never received compensation for these (presumably improper) seizures. See Vol. VIII, Ex. 191 at 997-98. Reposa was subsequently asked if on any of these occasions either he or his vessel had been convicted of illegally possessing flounder or groundfish during a closed season. See id. at 1000. He responded negatively. Id. Shortly thereafter, the Agency's counsel asked Reposa if a state district court judge had imposed a sentence in one of the three cases. See id. at 1001. Reposa's counsel objected on the ground that "[t]he charges being referenced are still under litigation in the Superior Court of the State of Rhode Island, and there has not been any final adjudication." Id. After the objection was overruled, see id., Reposa responded: "I don't know the answer to that," id. at 1002.

On redirect examination by his attorney, Reposa testified that the case about which the Agency's counsel had asked him was still pending. See id. at 1006. On re-cross, Reposa was asked if James Rattigan, the captain of the vessel involved, had entered a plea in the case or been convicted by a judge. See

Vol. VIII, Ex. 191 at 1011. Reposa responded that as far as he knew Rattigan had entered a plea of not guilty, see id. The Agency's counsel then asked Reposa if he was aware that the court had found Rattigan guilty, filed the case for a year, and required forfeiture of the catch of the vessel. Id. This prompted another objection from Reposa's counsel who again argued that there had been no final determination in Rattigan's case, see id., as a de novo appeal had been taken to the state superior court, see id. at 1012. After further colloquy, the ALJ overruled the objection. See id. at 1012-13. The Agency's counsel, however, did not seek an answer to the question from Reposa but moved on to another matter. See id. at 1013.

The Government later recalled Sergeant Longtin and over Reposa's objection introduced Ag. Ex. KK, a DEM report of the incident involving Rattigan. See id. at 1033-37; see also Vol. IX, Ex. 195, Tab KK (Report of DEM Sergeant Dean L. Lees). The report reflects that Reposa was present on the dock when DEM officers seized the catch from the vessel captained by Rattigan and that Reposa had yelled and sworn at them. See Vol. IX, Ex. 195 at Tab KK. According to the Agency's counsel, the report was offered to impeach "Mr. Reposa's testimony that he didn't have anything to do with this violation ...." Vol. VIII, Ex. 191 at 1036.

While Plaintiffs are correct that "an appeal from a conviction obtained in District Court serves to vacate automatically the conviction below ...," Plaintiffs' Mem. at 12 (quoting State v. Roderick, 403 A.2d 1090, 1092 (R.I. 1979)), strictly speaking Reposa was not impeached by the alleged conviction of Rattigan. Reposa testified that: "As far as I know he [Rattigan] entered a plea of not guilty. I was not there." Vol. VIII, Ex. 191 at 1011. Thus, Reposa did not deny that Rattigan had been convicted in the state district court.

Presumably, Plaintiffs' real complaint is that the Agency's counsel's questions implied that there had been a final guilty finding in Rattigan's case when Rhode Island law holds otherwise and that it was error for the ALJ to have overruled Reposa's counsel's objections to this "line of questioning," id. at 1001, 1013, see also id. at 999, 1000. Reposa's counsel initially objected on the ground that the questioning was "far beyond the scope of direct," id. at 999, that it was not relevant, see id., and that it was prejudicial, see id. In support of this objection, he asserted that Reposa "did not testify to any seizures on direct examination." Id. As to these contentions, the Court disagrees. Reposa testified on direct examination that the reason he wanted to pay the crew of the F/V SISTER ALICE in cash was because he had had other catches confiscated and he "knew this one was under scrutiny." Id. at 969. This opened the door for the Agency's counsel's inquiry on cross-examination about these other confiscations or seizures. See id. at 997. Thus, it was not error for the ALJ to have allowed Reposa to be cross-examined about the other occasions when his catches were seized, including the seizure which occurred when Rattigan was serving as captain.

While the objections to the two questions about the disposition of the charge against Rattigan, see id. at 1001, 1011, should have been sustained based on Rhode Island law, see State v. Roderick, 403 A.2d at 1092, this Court sees no prejudice to Reposa in the ALJ's contrary rulings. Reposa answered the first question by stating he did not know if there had been a guilty finding. See Vol. VIII, Ex. 191 at 1001-02. He did not answer the second question because after the objection was overruled the Agency's counsel did not ask it again but went onto another matter. Id. at 1011-13. Thus, although the ALJ erred in overruling the objections to the two questions, the errors were

harmless. There is nothing to indicate that the ALJ based his findings regarding Plaintiffs on a belief that Rattigan had been convicted in the state district court or on Reposa's answers to questions about the charge against Rattigan.

With regard to Ag. Ex. KK, the basis proffered by the Agency's counsel for its admission, namely, to impeach Reposa's testimony that "he didn't have anything to do with this violation ...," id. at 1036, appears to be thin at best. Reposa never testified that he did not have anything to do with the violation involving Rattigan. Rather, Reposa responded to a question about whether Rattigan had entered a guilty[34] plea or been convicted by a judge by stating: "As far as I know he entered a plea of not guilty. I was not there." Id. at 1011. While the last statement is ambiguous, from the context it seems more likely that Reposa meant that he was not present in the state district court with Rattigan and therefore did not know for certain the final disposition of the charge against Rattigan as opposed to having meant that he was not on the dock at the time the catch caught by Rattigan was seized. Consequently, as impeachment evidence, Ag. Ex. KK had dubious value.

Nevertheless, although Ag. Ex. KK may have been admitted in error, there is no indication that the ALJ relied upon it in any way for his findings. See Initial Decision. This Court declines to overturn a decision of an ALJ which is supported by substantial evidence merely because of an incorrect evidentiary ruling in the course of a lengthy trial when there is no indication that the improperly admitted evidence played any role

---

[34] Technically, the Agency's counsel did not ask Reposa if Rattigan had entered a plea of guilty, but it is clear from the context that this was what counsel meant and what Reposa understood the question to mean. See Vol. VIII, Ex. 191 at 1011 ("Okay. And in June of 2001, Mr. Rattigan -- do you know if he entered a plea, or was he convicted by a Judge?").

in the ALJ's decision.

As for Plaintiffs' complaint that on multiple occasions questioning far beyond the scope of direct examination was allowed to the Agency's counsel by the ALJ, Plaintiffs' sole citation to support this charge is "Page 997 et seq. ...." Plaintiffs' Mem. at 13. Because the Court has already determined that the cross-examination of Reposa was proper, see Discussion Section VI. A. 6. a. supra at 39 (finding that Reposa opened the door for the inquiry which began at 997), this claim of error is rejected.

**b. Allegedly Inappropriate Rebuttal**

Plaintiffs also complain that the ALJ allowed inappropriate rebuttal, see Plaintiffs' Mem. at 13, and cite three pages of the record where this allegedly occurred, see id. (citing Vol. VIII, Ex. 192 at 1074, 1089, 1096). The first citation appears to pertain to Ag. Ex. SS (canceled checks from Reposa d/b/a F/V DONA MARIA). See Vol. VIII, Ex. 192 at 1073-74, 1076; see also Vol. IX, Ex. 195, Tab SS. As the Court has already determined that Ag. Ex. SS was properly admitted, see Discussion Section VI. A. 3. supra at 30-31, Plaintiffs' claim of inappropriate rebuttal involving Ag. Ex. SS is rejected.

The second instance of allegedly improper rebuttal pertains to the admission of Ag. Exs. MM through WW. See Plaintiffs' Mem. at 13 (citing Vol. VIII, Ex. 192 at 1089 (admitting Ag. Exs.)); see also Vol. IX, Ex. 195, Tabs MM-WW (containing the exhibits). The Court has previously determined that there was no error in the ALJ's consideration of Ag. Exs. QQ-WW. See Discussion Section VI. A. 3. supra at 30-31. Turning to Ag. Exs. MM-PP, Ag. Exs. MM and NN are respectively cellphone records for the F/V DONA MARIA and Bruce Hawkins. Because the Court has already determined that the ALJ did not rely upon such cellphone records for his findings, see Discussion Section VI. A. 4. supra at 34,

it is unnecessary to determine whether they constituted inappropriate rebuttal as any error would be harmless in that regard. The same is true for Ag. Ex. OO, a phone number identification prepared by NMFS SA McCarron. See Vol. IX, Ex. 195, Tab OO. Ex. PP is Reposa Fisheries, Inc. Answers to Agency's Interrogatories, see Vol. IX, Ex. 195, Tab PP, and they are part of the pleadings in the case. The Court sees nothing improper in their being admitted as a full exhibit. See Vol. VIII, Ex. 192 at 1089.

The final instance of allegedly inappropriate rebuttal concerns the testimony of SA McCarron. See Plaintiffs' Mem. at 13 (citing Vol. VIII, Ex. 192 at 1096). McCarron testified regarding his comparison of information contained in Chappell's personal log book, the FVTRs, and the dealers' reports. See Vol. VIII, Ex. 192 at 1090-91. He further testified that the tow times for the July 5 and 6, 1999, trips of the F/V SISTER ALICE were the shortest tow times of all the trips he compared. See id. at 1095. Once again there is nothing to indicate that the ALJ relied for his findings upon any of the information which was the subject of this allegedly improper rebuttal. Accordingly, Plaintiffs' claim of procedural error on this basis is rejected.

**B. The Penalties**

Plaintiffs argue that the penalties and permit sanctions are excessive given the record evidence as to their ability to pay. See Plaintiffs' Mem. at 10, 12. They contend that a fair consideration of the relevant evidence leads to the conclusion that their ability to pay any penalty was "substantially impaired, regardless of any perceived, abstract net worth." Id. at 11. They also charge that the "Agency interpreted the required standard of compliance ... to be one of mechanical perfection ...," id., and that the ALJ "assessed draconian financial penalties likely to not only beggar ... Reposa, but

deprive a number of fishermen, including ... Chappell, of the most viable means of supporting themselves," id. at 12.

In reviewing the penalties imposed upon Plaintiffs, the Court applies an abuse of discretion standard. See Lovgren v. Byrne, 787 F.2d 857, 867 (3rd Cir. 1986)(finding no abuse of discretion where ALJ imposed a greater penalty than the government had sought where ALJ explicitly took into account each factor required by the statute, 18 U.S.C. § 1858(a),[35] and explained why he felt justified in assessing the maximum penalty allowed). Under an abuse of discretion standard, the amount of the penalty will not be disturbed unless there is a definite and firm conviction that the ALJ committed a clear error of judgment in the conclusions he reached upon weighing of the relevant factors. Diehl v. Franklin, 826 F.Supp. 874, 880 (D.N.J. 1993); see also Stillufsen v. Evans, No. 03-2355 (MLC), 2005 WL 2175441, at *8 (D.N.J. Sept. 6, 2005)(quoting Diehl v. Franklin, 826 F.Supp. at 880 (citing Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 48 (3rd Cir. 1991)(quotations omitted))).

In the instant matter, the ALJ considered whether the penalties proposed by NOAA were reasonable and appropriate. See

---

[35] 16 U.S.C. § 1858(a) provides in relevant part:

> The amount of the civil penalty shall not exceed $100,000 for each violation .... **In determining the amount of such penalty, the Secretary shall take into account the nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require.** In assessing such penalty the Secretary may also consider any information provided by the violator relating to the ability of the violator to pay, *[p]rovided*, [t]hat the information is served on the Secretary at least 30 days prior to an administrative hearing.

16 U.S.C. § 1858(a) (bold added).

Initial Decision at 23. He noted that the offenses committed by Plaintiffs, making false statements in the FVTRs and filing those documents with the NMFS, undermined NOAA's conservation efforts. See id. He found that Plaintiffs had "committed serious offenses," id., that they had willfully violated the Act, id., and that they had "then attempted to cover their wrongdoings," id. The ALJ also noted that NOAA had chosen not to assess the maximum fine penalties ($50,000.00 for each violation), see id. (citing Vol. IX, Ex. 195, Tab FF (Penalty Schedule)), and that the charges were Plaintiffs' first violations, see id. Addressing the matter of the permit sanction, the ALJ recognized that the ninety day suspension sought by NOAA of Chappell's and Reposa's operator permits and of the F/V DONA MARIA fishing vessel permit was the maximum permit sanction which could be imposed for violations of 50 C.F.R. § 648.14(a)(3) and (4). Id. at 24. However, the ALJ found that because of "the egregious nature of the Respondents['] violations and the fact that they attempted a cover up, the permit sanction is deemed appropriate." Id.

In his Modified Decision, the ALJ again explained his reasons for the fines and permit sanctions which he had ordered in the Initial Decision. See Modified Decision at 2-3. He reiterated that Plaintiffs, by filing FVTRs containing false or inaccurate information to cover up the F/V DONA MARIA's landing of regulated species while not called into the DAS program and by conspiring to evade detection, "directly impeded the Agency's ability to carryout its responsibilities under the Magnuson-Stevens Act." Modified Decision at 2. In rejecting Plaintiffs' arguments against imposition of a ninety day permit sanction for the F/V SISTER ALICE, the ALJ distinguished Plaintiffs' conduct from that of the respondents in In the Matter of: T.M.F., Inc., & James A. Ballance, 1995 NOAA LEXIS 52, at *10, aff'd in part,

1997 NOAA LEXIS 8 (Order Dismissing Penalty against Respondent Ballance May 27, 1997). Id. He noted that the respondents in T.M.F., Inc. had not made any false statements or attempted to cover up their wrongdoings and that they appeared to be acting under a mistaken belief concerning the regulatory requirements. Id. In contrast, in the instant case:

> the [Plaintiffs] were fully aware that the F/V DONA MARIA could not land regulated species while not called into the Days-At-Sea Program, and the operator and owner of the F/V SISTER ALICE attempted to cover up the DONA MARIA's malfeasance by making false statements to law enforcement officers and on its FVTR and conspiring with the F/V DONA MARIA to do the same. Thus, the additional permit sanction is warranted to send a clear message that engaging in such fraudulent activities and conspiracy will not be tolerated.

Modified Decision at 3.

While the ALJ concluded that the interest of justice required that the ninety day permit sanction against the F/V SISTER ALICE and Chappell be spread over a three year period, see id., the ALJ declined to similarly modify the permit sanction against Reposa, see id. Explaining this disparity, the ALJ wrote that he found Reposa's "conduct reprehensible in that he involved a number of other individuals in the violations in a failed effort to go undetected and hide or cover up the violations." Id.

The foregoing amply demonstrates that the ALJ complied with the requirements of the statute that he "take into account the nature, circumstances, extent, and gravity of the prohibited acts committed ...," 16 U.S.C. § 1858(a), and Plaintiffs' "degree of culpability [and] any history of prior offenses ...," id., in determining the amount of the penalty. The reasons he gave are supported by substantial evidence in the record.

With regard to ability to pay, the ALJ found that Chappell only had a limited ability to pay the civil penalty. See Initial

Decision at 23 (citing Vol. IX, Ex. 195, Tab GG (Hellerman Report) at 6-7; Vol. X, Ex. 197, Tab 5 (Financial Statement for Chappell); id., Tab 6 (2001 Federal Income Tax Return for Chappell); Vol. VIII, Ex. 191 at 928,[36] 949-950). However, the ALJ correctly noted that Chappell's limited ability to pay is not dispositive of the issue of the size of the penalty to be assessed, see id., where the penalty is imposed jointly and severally and there is evidence that the other party held liable has the ability to pay, see Fishing Co. of Alaska v. United States, 195 F.Supp.2d 1239, 1256 (W.D. Wash. 2002)(holding that because individual captains were jointly and severally liable with the company, "the Agency need only have presented evidence of the company's ability to pay"); see also In the Matter of Flying Cloud, Inc. & Patrick J. Carr, 1994 NOAA LEXIS 7, at *33 (Dec. 16, 1994)(stating that inability of individual respondent to pay entire penalty should not affect his liability where the penalty was imposed jointly and severally on him and corporate respondent), aff'd, 1995 NOAA LEXIS 48 (Nov. 9, 1995)(Order Denying Discretionary Review). The ALJ found that Reposa Fisheries had failed to show that it lacked the ability to pay. See Initial Decision at 23. He noted that NOAA's financial expert, Gerald Hellerman, had reviewed the company's tax returns for 1998 through 2001, the Statement of Financial Condition filed on behalf of the company, and its Experian Business Profile. Id. at 23-24 (citing Vol. IX, Ex. 195, Tab GG at 3-4; Vol X, Ex. 197, Tab 7 (Financial Statement for Reposa Fisheries), Tab 8 (2001 Federal Income Tax Return for Reposa Fisheries). Hellerman testified that Reposa Fisheries could pay the assessed $45,000.00 penalty, see Vol. VIII, Ex. 191 at 928, although he later

---

[36] NOAA financial expert Gerald Hellerman concluded that Chappell "could pay a civil penalty of approximately $2,000." Vol. VIII, Ex. 191 at 928.

indicated that his conclusions were "based primarily on the net worth of Mr. Reposa and also supported by his historical earnings," id. at 938, and his belief that "Reposa Fisheries could reasonably be expected to obtain funds directly or indirectly[37] from Mr. Reposa," id. at 945.[38] Hellerman acknowledged that "[o]n a stand-alone basis, with no outside support ...," id. at 946, Reposa Fisheries could not pay the penalties assessed, id.[39]

The ALJ recognized that absent piercing the corporate veil Reposa had no obligation to lend Reposa Fisheries money to pay the penalty or guarantee a loan, see Initial Decision at 24, and that without outside support Reposa Fisheries would not be able to pay the civil penalty, see id. However, he found that this circumstance was not controlling given that 15 C.F.R. § 904.108(d) provides in relevant part that:

> A respondent will be considered able to pay a civil penalty even if he or she must take such actions as pay in installments over time, borrow money, liquidate assets, or reorganize his or her business. NOAA's consideration of a respondent's ability to pay does not preclude an assessment of a civil penalty in an amount that would cause or contribute to the bankruptcy or other discontinuation of the respondent's business.

---

[37] Hellerman explained that by "indirectly," Vol. VIII, Ex. 191 at 945, he meant that Reposa could guarantee a loan for the company, id.

[38] In his report, Hellerman stated that Reposa Fisheries had a net worth of $25,165.00, see Vol. IX, Ex. 195, Tab GG at 3, and that "[b]ased on the fair market value of the F/V SISTER ALICE, it seems reasonsable to conclude that financing could be arranged, either from its bank or an asset-based lender, to fund the payment of a portion of the $45,000 penalty – perhaps $15,000," id. at 4.

[39] In making this acknowledgment, Hellerman was responding to a question which asked whether "the SISTER ALICE" had the ability to pay the penalties assessed. See Vol. VIII, Ex. 191 at 946. The F/V SISTER ALICE is owned by Reposa Fisheries, see Vol. VI, Ex. 188 at 8-9; Vol. VIII, Ex. 191 at 902, and for practical purposes is Reposa Fisheries, see Vol. VIII, Ex. 191 at 870, 889, 912.

15 C.F.R. § 904.108(d).

This Court has reflected at length upon the fact that the ALJ imposed a $45,000.00 penalty jointly and severally upon Chappell and Reposa Fisheries notwithstanding the fact that he found that Chappell had only a limited ability to pay a civil penalty, see Initial Decision at 23; see also Vol. VIII, Ex. 191 at 928 (NOAA's financial expert testifying that Chappell "could pay a civil penalty of approximately $2,000"); see also id. at 950 (same), and that Reposa Fisheries would not be able to pay the penalty without outside support, see Initial Decision at 24; see also Vol. VIII, Ex. 191 at 946 (NOAA's financial expert so testifying); see id. at 945 ("I would say that Reposa Fisheries could reasonably be expected to obtain funds directly or indirectly from Mr. Reposa."). The apparent rationale for upholding a jointly and severally imposed fine which exceeds the ability of one party to pay is that the fine can be collected from the other party or parties liable who do have the ability to pay. See Fishing Co. of Alaska v. United States, 196 F.Supp. at 1256; see also In the Matter of Flying Cloud, Inc. & Patrick J. Carr, 1994 NOAA LEXIS 7, at *33 (Dec. 16, 1994), aff'd, 1995 NOAA LEXIS 48 (Nov. 9, 1995)(Order Denying Discretionary Review). In the instant matter, the Government's financial expert opined that Reposa Fisheries could pay the $45,000.00 fine, see Vol. VIII, Ex. 191 at 928, but he acknowledged: 1) that without outside support the company could not pay the fine, see id. at 946; 2) that his opinion that Reposa Fisheries could pay the fine depended on Reposa providing funds directly or indirectly to the company, see id. at 945; 3) that Reposa had no legal obligation to provide such funds, see id. at 946, 949, only his "economic self-need," id. at 949; and 4) that if no support were provided by Reposa and the company had to liquidate, its net worth would

be approximately $25,000.00, id. at 946.[40] These facts caused the Court to focus squarely on the issue of whether there is substantial evidence in the record to support the imposition of the $45,000.00 fine jointly and severally against Chappell and Reposa Fisheries when the ability of the latter to pay the fine depends upon Reposa providing funds to the company.

The Court considered, but ultimately rejected, finding that there was only substantial evidence to support imposition jointly and severally of a fine against Chappell and Reposa Fisheries of no greater than $25,000.00 (the amount which would be realized if Reposa Fisheries were forced to liquidate, see Vol. VIII, Ex. 191 at 946). The Court rejected this finding for three reasons. First, the Court cannot say that the ALJ's reliance upon 15 C.F.R. § 904.108(d) as authority to impose a fine which may result in the company's bankruptcy or cessation of business is misplaced or legally incorrect. Second, as the Government's financial expert noted, it is in Reposa's self interest to assist Reposa Fisheries, see Vol. VIII, Ex. 191 at 949, "[a]nd it's not unusual for corporations to obtain funds from their major shareholder of affiliated companies ...," see id. at 946; cf. Carroll v. Comm'r of IRS, No. 1221--75, 1978 WL 2868 (T.C. May 10, 1978)("It is not unusual for the sole shareholder of a corporation to be required to guarantee the obligations of the

---

[40] At the hearing, Plaintiffs' counsel attempted to show that the net worth of Reposa Fisheries if it had to liquidate would be less than $25,000.00 because it allegedly had $15,000.00 or $16,000.00 in "payables." Vol. VIII, Ex. 191 at 948. However, the Statement of Financial Condition, see Vol. X, Ex. 197, Tab 7 (Statement of Financial Condition for Reposa Fisheries) at 2, which the Government's financial expert utilized for his analysis does not reflect such payables, see Vol. VIII, Ex. 191 at 947. Hellerman testified that if the company's net worth were reduced by "payables" not reflected on the balance sheet (statement of financial condition), it should also be increased for "additional cash from their operations to date." Id. at 948. Accordingly, the Court accepts $25,000.00 as being the value of Reposa Fisheries if it were forced to liquidate. See id. at 946.

corporation."). Third, this Court lacks "a definite and firm conviction that the [ALJ] committed a clear error of judgment in the conclusion [he] reached upon a weighing of the relevant factors [regarding the amount of the penalty to be imposed against Chappell and Reposa Fisheries]." Diehl v. Franklin, 826 F.Supp. 874, 880 (D.N.J. 1993)(first and second alterations in original). Accordingly, I find that substantial evidence supports the ALJ's imposition of a $45,000.00 fine jointly and severally against Chappell and Reposa Fisheries.

Regarding the $40,000.00 fine imposed upon Reposa, the ALJ found that he had the ability to pay this penalty. See Initial Decision at 24 (citing Vol. IX, Ex. 195, Tab GG (Hellerman Report); Vol X, Ex. 196, Tab 3 (Reposa Financial Statement); id. Tab 4 (Reposa's 2001 Federal Income Tax Return); Vol. VIII, Ex. 191 at 919-20, 929, 938-41). This finding is supported by substantial evidence in the record. Hellerman testified that Reposa had the ability to pay the fine based solely on his net worth of $740,806.00. See Vol. VIII, Ex. 191 at 929, 954; see also Vol X, Ex. 196, Tab 3 (Reposa Financial Statement) at 4. Plaintiffs' expert, Mr. Thomas Markarian, agreed with this statement of Reposa's net worth. See Vol. VIII, Ex. 191 at 919. Hellerman also testified that Reposa's total income was $308,365.00 in 1998, see Vol. VIII, Ex. 191 at 930, $329,923.00 in 1999, see id. at 929, $225,699.00 in 2000, see id., and $128,976.00 in 2001, see id.[41] His average income for 1999, 2000, and 2001, the latest three years for which he provided tax returns, was $287,996.00. See Vol. IX, Ex. 195, Tab GG at 6.

---

[41] Reposa testified to lower total income figures for 1999, 2000, and 2001, see Vol. VIII, Ex. at 191 at 875, but Hellerman noted that the figures given by Reposa were his adjusted gross income which included deductions for alimony paid, SEP retirement plan contributions, part of the self-employment health insurance premiums, and half of the self-employment tax payments, see id. at 930.

While Hellerman acknowledged that Reposa's income had declined significantly in 2001, see Vol. VIII, Ex. 191 at 937-38, Hellerman indicated that his conclusion regarding Reposa's ability to pay was based primarily on Reposa's net worth and "also supported by his historical earnings," id. at 938; see also id. at 940.

The ALJ was not required to accept Reposa's testimony that the imposition of a major financial penalty would result in the loss of his business, the loss of his home, and the loss of his ex-wife's home. See Vol. VIII, Ex. 191 at 879. Indeed, Reposa's highly improbable claim that repairing the engine in the F/V DONA MARIA would not increase the vessel's value, see id. at 879-80, by itself provided a basis for discounting his testimony regarding ability to pay. As Hellerman explained: "if you're going to put in a major overhaul and other equipment, it would have to increase some amount." Id. at 931; see also id. at 944 ("[I]f the engine were in poor condition and [the vessel] was worth $600,000$_{[,]}$ with a good engine$_{[]}$ it should be worth more than $600,000.00."[42]). Even Plaintiffs' expert, Mr. Markarian, acknowledged that such repair would increase the value of the vessel to some extent, although not on a "dollar for dollar" basis, id. at 923.

In summary, the Court finds that the ALJ considered the relevant factors in determining the financial penalties and permit sanctions to be imposed. The amount of those penalties and the length of the permit sanctions is supported by substantial evidence in the record. The court concludes that the ALJ did not abuse his discretion in imposing such penalties and

---

[42] For clarity, the Court has modified the punctuation of this testimony. See Vol. VIII, Ex. 191 at 944. In the record, the testimony appears as: "Well, if the engine were in poor condition and it was worth $600,000 with a good engine, it should be worth more than $600,000.00." Id.

sanctions. Accordingly, Plaintiffs' claim that the penalties and permit sanctions imposed are excessive is rejected.

**VI. Conclusion**

For the reasons stated above, I recommend that Plaintiffs' Motion for Summary Judgment be denied and that the Government's Motion for Summary Judgment be granted. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

David L. Martin

DAVID L. MARTIN
United States Magistrate Judge
June 13, 2006